**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OTTO DELCID and LUZ ROMAN, on behalf of themselves and all others similarly situated,<br><br>                               Plaintiffs,<br><br>        v.<br><br>UNILEVER UNITED STATES, INC.,<br><br><br>                               Defendant. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Otto Delcid and Luz Roman ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Unilever United States, Inc. ("Unilever" or "Defendant").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

**NATURE OF THE ACTION AND FACTS COMMON TO ALL CLAIMS**

1.      This is a class action lawsuit regarding Defendant's manufacturing, distribution, and sale of Brut antiperspirant aerosol and spray products (the "Products") that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.      Brut is a brand of antiperspirants manufactured, distributed, and sold by Defendant.  The Brut Products discussed herein contain benzene, a carcinogenic chemical impurity that has been linked to leukemia and other cancers.  The Products are not designed to contain benzene, and in fact no amount of benzene is acceptable in antiperspirant sprays such as the Products manufactured by Defendant.  The presence of benzene in the Products renders them

1

adulterated and misbranded, and therefore illegal to sell under both federal and state law.  As a result, the Products are unsafe and illegal to sell under federal law, and therefore worthless.  *See* 21 U.S.C. §§ 331(a), 352; *see also Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.,* 2021 WL 222776, at \*16 (D.N.J. Jan. 22, 2021).

3.     Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.  The Department of Health and Human Services has determined that benzene causes cancer in humans.  Likewise, the Food and Drug Administration ("FDA") lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."  Benzene is associated with blood cancers such as leukemia.[1]  A study from 1939 on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe,"[2]  which is a comment reiterated in a 2010 review of benzene research specifically stating: "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[3]

4.     According to the American Cancer Society:

IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute

---

[1] National Cancer Institute, Cancer-Causing Substances, Benzene. https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

[2] Hunter, F.T. (1939). Chronic Exposure to Benzene (Benzol). II. The Clinical Effects. *Journal of Industrial Hygiene and Toxicology*. 1939 Vol.21 pp.331-54, https://www.cabdirect.org/cabdirect/abstract/19402700388.

[3] Smith, Martyn T. (2010). Advances in Understanding Benzene Health Effects and Susceptibility. *Annual Review of Public Health*. 2010 Vol. 31:133-148, https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[4]

5.      Moreover, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[5]

6.      According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, **skin absorption**, ingestion, **skin** and/or eye contact."[6]  Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

7.      On November 3, 2021, Valisure, an online pharmacy registered with the FDA, "detected high levels of benzene and other contaminants in specific batches of body spray products, some of which contain active pharmaceutical ingredients aluminum chlorohydrate or aluminum sesquichlorohydrate."[7]

8.      Valisure tested the Products manufactured by Defendant, which were found to contain as much as 4.13 parts per million of benzene[8]:

---

[4] American Cancer Society. Benzene and Cancer Risk (January 5, 2016) (https://www.cancer.org/cancer/cancer-causes/benzene.html)

[5] Centers for Disease Control and Prevention, Facts About Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[6] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html.

[7] VALISURE, VALISURE CITIZEN PETITION ON BENZENE IN BODY SPRAY PRODUCTS, Nov. 3, 2021, https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Body-Spray-v4.0-3.pdf (the "Valisure Petition"), at 1.

[8] *Id.* at 13.

| Brand | UPC | Lot | Expiration | Description | Average ppm |
|-------|-----|-----|------------|-------------|-------------|
| Brut | 827755070108 | (L)21155 | 05/2023 | Classic, 24 Hr Protection | 4.13 |
| Brut | 827755070085 | (L)21167 | 05/2023 | Classic, 24 Hr Protection | 2.34 |

9.      The FDA does state that if the use of benzene is "**<u>unavoidable</u>** in order to produce a drug product with a significant therapeutic advance," then the drug product may contain up to 2 ppm of benzene.[9]  However, many of Defendant's Products that were tested contain levels of benzene above this amount.  Regardless, according to Valisure, "[b]ecause many of the body spray products Valisure tested did not contain detectable levels of benzene, it does not appear that benzene use is unavoidable for their manufacture, and considering the long history and widespread use of these products, it also does not appear that they currently constitute a significant therapeutic advance."[10]  Accordingly, **<u>any</u>** level of benzene in Defendant's Products is unacceptable and therefore renders the Products adulterated, misbranded, unsafe, and worthless.

10.      Defendant did not disclose the actual or potential presence of benzene in its antiperspirant products on the Products' labeling, or in any advertising or website promoting the Products.  Defendant did not disclose the presence of benzene in the Products to Plaintiffs or Class members at the point of sale or at any time before the point of sale.

---

[9] *Id.* at 1 (emphasis added).

[10] *Id.* at 1-2.

11.     Antiperspirant body sprays are considered over-the-counter ("OTC") drugs that are regulated by the United States Food & Drug Administration ("FDA") pursuant to the federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, as well as analogous state statutes and regulations.

12.     As OTC drug products regulated by the FDA, the Products must be both safe and effective and are subject to federal current Good Manufacturing Practices ("cGMP") regulations and the FDCA's state-law analogues.  These cGMP regulations require OTC medications like the Products to meet safety, quality, purity, identity, and strength standards.  *See* 21 U.S.C. § 51(a)(2)(B).  Federal and state regulatory regimes require that labeling for OTC products identify each active and inactive ingredient.[11]  21 C.F.R. 201.66 establishes labeling requirements for OTC products and defines an inactive ingredient as "any component other than an active ingredient."  An "active ingredient" is "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans.  **The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form** intended to furnish the specified activity or effect." (Emphasis added).

13.     21 C.F.R. § 210.1(a) states that the cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and

---

[11] https://www.fda.gov/media/72250/download.

purity characteristics that it purports or is represented to possess."  In other words, entities at all

phases of the design, manufacture, and distribution chain are bound by these requirements.

14.     The FDA's cGMP regulations are found in 21 C.F.R. Parts 210 and 211.  These

detailed regulations set forth minimum standards regarding: organization and personnel (Subpart

B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug

product containers and closures (Subpart E); production and process controls (Subpart F);

packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory

controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products

(Subpart K).  The FDA has worldwide jurisdiction to enforce these regulations if the facility is

making drugs intended to be distributed in the United States.

15.     Any drug product not manufactured in accordance with cGMPs is deemed

"adulterated" or "misbranded" and may not be distributed or sold in the United States.  *See* 21

U.S.C. §§ 331(a), 351(a)(2)(B).  States have enacted laws adopting or mirroring these federal

standards.

16.     FDA regulations require a drug product manufacturer to have "written procedures

for production and process control designed to assure that the drug products have the identity,

strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

17.     A drug product manufacturer's "[l]aboratory controls shall include the

establishment of scientifically sound and appropriate specifications, standards, sampling plans,

and test procedures designed to assure that components, drug product containers, closures, in-

process materials, labeling, and drug products conform to appropriate standards of identity,

strength, quality, and purity." 21 C.F.R. § 211.160.

18.    "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194.

19.    Defendant disregarded the cGMPs outlined above.  As a manufacturer, distributor, and seller of an OTC drug product, Defendant had and has a duty to ensure that its Products did not contain excessive (or any) levels of benzene, including through regular testing. But based on Valisure's testing results set forth above, Defendant made no reasonable effort to test its Products for benzene or other impurities.  Nor did it disclose to Plaintiffs or any other consumers in any product advertising, labeling, packaging, or marketing that its antiperspirant products contained benzene, let alone at levels that are many multiples of the emergency, interim limit set by the FDA.  To the contrary, Defendant represented and warranted, expressly and impliedly, that the Products were of merchantable quality, complied with federal and state law, and did not contain carcinogens, reproductive toxins, or other impurities such as benzene.

20.    If Defendant had not routinely disregarded the FDA's cGMPs, or had fulfilled their quality assurance obligations, Defendant would have identified the presence of the benzene contaminant almost immediately.

21.    Further, had Defendant adequately tested its Products for benzene and other carcinogens, reproductive toxins, and impurities, it would have discovered that its Products contained benzene at levels above the FDA's limit (to the extent even applicable), making those products ineligible for distribution, marketing, and sale.

22.     Accordingly, Defendant knowingly, or at least negligently, introduced contaminated, adulterated, and/or misbranded Products containing dangerous amounts of benzene into the U.S. market.

23.     Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."

24.     Ironically, Defendant actually touts that "[p]roduct safety is [its] top priority."[12] Defendant represents that "[a]t a minimum we ensure our products comply with applicable laws. In several areas we set our standards higher than those required by law.  When this happens we also expect our suppliers and partners to meet these standards."  Defendant further represents that "[b]efore we launch a product our [Safety and Environmental Assurance Centre] scientists work with teams across Unilever to assess the product's safety and impact on the environment." Based on the foregoing, however, these representations are false.  Defendant has not ensured compliance with applicable laws (or any "higher standards" it claims to maintain) because its failure to comply with cGMPs resulted in the contamination of its Products with benzene.

25.     The presence of benzene—and Defendant's failure to comply with cGMPs— renders the Products both adulterated and misbranded under the FDCA.  The Products are adulterated because they are "drug[s] and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets

---

[12] https://www.unilever.com/brands/Our-products-and-ingredients/Our-approach-to-the-safety-of-products-and-ingredients/.

the quality and purity characteristics, which it purports or is represented to possess."  21 U.S.C. § 351(a)(1).

26.    The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose the presence of benzene.  21 U.S.C. § 352(a)(1).

27.    Under federal law, a product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold.  21 U.S.C. § 331(a).  Adulterated and misbranded products thus have no economic value and are legally worthless.

28.    When Plaintiffs purchased Defendant's Products, Plaintiffs did not know, and had no reason to know, that Defendant's Products were adulterated and misbranded and thus unlawful to sell or purchase as set forth herein.  Not only would Plaintiffs not have purchased Defendant's Products at all had they known the Products contained benzene, they would not have been capable of purchasing them if Defendant had done as the law required and tested those products for benzene and other carcinogens, reproductive toxins, and impurities.

29.    Moreover, no reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (even assuming those allowances apply to Defendant's products).

30.    Thus, if Plaintiffs and Class members had been informed that Defendant's Products contained or may contain benzene, they would not have purchased or used the Products at all, or would have paid significantly less for the Products, making such omitted facts material to them.

31.    Plaintiffs and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene, and Defendant has failed to warn consumers of this fact.  Such illegally sold

products are worthless and have no value.  *See Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021) ("This Court finds that contaminated drugs are economically worthless at the point of sale by virtue of the dangerousness caused by their contamination, regardless whether the sold VCDs actually achieved the medical purpose of lowering blood pressure.  Put differently, contaminated drugs, even if medically efficacious for their purpose, cannot create a benefit of the bargain because the contaminants, and their dangerous effects, were never bargained for.").

32.     Plaintiffs and Class members bargained for antiperspirant products free of contaminants and dangerous substances, and were deprived the basis of their bargain when Defendant sold them products containing the dangerous substance benzene, which rendered the Products unmerchantable and unfit for use.

33.     Plaintiffs and Class members are further entitled to damages for the monies paid to purchase the Products, statutory and punitive damages, attorneys' fees and costs, and injunctive relief.

34.     Plaintiffs bring this action on behalf of themselves and the Class for equitable relief and to recover damages and restitution for: (i) breach of express warranty; (ii) breach of implied warranty; (iii) violation of New York General Business Law ("GBL") § 349; (iv) violation of GBL § 350; (v) fraud; and (vi) unjust enrichment.

## PARTIES

35.     Plaintiff Otto Delcid is a resident of Hamilton Heights, New York and has an intent to remain there, and is therefore a domiciliary of New York.  In or about September 2021, Mr. Delcid purchased a canister of Defendant's Brut Classic, 24 Hour Protection from a Rite Aid

in Manhattan.  When purchasing the Brut Product, Mr. Delcid reviewed the accompanying labels

and disclosures, and understood them as representations and warranties by the manufacturer that

the Brut Product was properly manufactured, free from defects, safe for its intended use, not

adulterated or misbranded, and legal to sell.  Mr. Delcid relied on these representations and

warranties in deciding to purchase the Brut Product manufactured by Defendant, and these

representations and warranties were part of the basis of the bargain, in that he would not have

purchased the Brut Product from Defendant if he had known that it was not, in fact, properly

manufactured, free from defects, safe for its intended use, adulterated and misbranded, and legal

to sell.  Mr. Delcid's Brut Product was contaminated with benzene, therefore rendering it

improperly manufactured, defective, not safe for its intended use, adulterated and misbranded,

and illegal to sell.

36.     Plaintiff Luz Roman is a resident of The Bronx, New York and has an intent to

remain there, and is therefore a domiciliary of New York.  In or about April 2020, Ms. Roman

purchased a canister of Defendant's Brut Classic, 24 Hour Protection from a Dollar General in

The Bronx.  When purchasing the Brut Product, Ms. Roman reviewed the accompanying labels

and disclosures, and understood them as representations and warranties by the manufacturer that

the Brut Product was properly manufactured, free from defects, safe for its intended use, not

adulterated or misbranded, and legal to sell.  Ms. Roman relied on these representations and

warranties in deciding to purchase the Brut Product manufactured by Defendant, and these

representations and warranties were part of the basis of the bargain, in that she would not have

purchased the Brut Product from Defendant if she had known that it was not, in fact, properly

manufactured, free from defects, safe for its intended use, adulterated and misbranded, and legal

to sell.  Ms. Roman's Brut Product was contaminated with benzene, therefore rendering it

improperly manufactured, defective, not safe for its intended use, adulterated and misbranded, and illegal to sell.

37.     Defendant Unilever United States, Inc. is a Delaware corporation with its headquarters at 700 Sylvan Avenue, Englewood Cliffs, New Jersey 07642.  Unilever distributes the Brut Products throughout the United States and the State of New York.  The Brut Products, including the adulterated Products purchased by Plaintiffs and members of the putative Classes, are available at retail stores throughout New York and the United States.

## JURISIDICTION AND VENUE

38.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

39.     This Court has personal jurisdiction over Defendant because Plaintiffs purchased the Brut Products in this District.

40.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## CLASS ACTION ALLEGATIONS

41.     Plaintiffs seek to represent a class defined as all persons in the United States who purchased the Products (the "Class").

42.     Plaintiffs also seek to represent a subclass of all Class members who purchased the Products in New York (the "Subclass").

43.     The Class and Subclass are collectively referred to as the "Classes."

44.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

45.     Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

46.     **Numerosity.**  The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed members are unknown to Plaintiffs, the true number of members of the Classes are known by Defendant.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

47.     **Typicality.**  The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all members of the Classes, purchased the Brut Products, which were worthless due to the presence of benzene, a harmful and carcinogenic chemical impurity.  The representative Plaintiffs, like all members of the Classes, have been damaged by Defendant's misconduct in the very same way as the members of the Classes.

Further, the factual bases of Defendant's misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

48.     **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

(a)   whether the Products manufactured by Defendant contain dangerously high levels of benzene, thereby breaching the express and implied warranties made by Defendant and making the Products unfit for human use and therefore unfit for their intended purpose;

(b)   whether Defendant knew or should have known the Products contained elevated levels of benzene prior to selling them, thereby constituting fraud and/or fraudulent concealment;

(c)   whether Defendant is liable to Plaintiffs and the Classes for unjust enrichment;

(d)   whether Defendant is liable to Plaintiffs and the Classes for fraud;

(e)   whether Plaintiffs and the Classes have sustained monetary loss and the proper measure of that loss;

(f)   whether Plaintiffs and the Classes are entitled to declaratory and injunctive relief;

(g)   whether Plaintiffs and the Classes are entitled to restitution and disgorgement from Defendant; and

(h)   whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

49.   **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs have retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes.  Plaintiffs have no interests that are antagonistic to those of the Classes.

50.   **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

51.   In the alternative, the Classes may be certified because:

(a)   the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendant;

(b)   the prosecution of separate actions by individual members of the

15

Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)     Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### Breach Of Express Warranty

52.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1-51 above as though fully set forth herein.

53.     Plaintiffs bring this claim individually and behalf of the members of the proposed Classes against Defendant.

54.     In connection with the sale of the Products, Defendant, as the designer, manufacturer, marketer, distributor, and/or seller issued written warranties by representing that the Products were antiperspirants and deodorants that contained only those active and inactive ingredients listed on the Products' labels.  Those active and inactive ingredients do not include benzene, a known human carcinogen dangerous to humans.

55.     As a direct and proximate cause of Defendant's breach of express warranty, Plaintiffs and the Classes have been injured and harmed because they would not have purchased the Products on the same terms if they knew that the Products contained benzene and are not generally recognized as safe.

56.     On November 16, 2021, prior to filing this action, Defendant was served with a pre-suit notice letter on behalf of Plaintiffs that complied in all respects with U.C.C. §§ 2-313

and 2-607.  Plaintiffs' counsel sent Defendant a letter advising Defendant that it breached an express warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiffs' counsel's letter is attached hereto as **Exhibit 1**.

## COUNT II
### Breach of Implied Warranty

57.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1-51 above as though fully set forth herein.

58.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.

59.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the Products (i) would not contain elevated levels of benzene and (ii) are generally recognized as safe for human use.

60.     Defendant breached the warranty implied in the contract for the sale of the defective Products because they could not pass without objection in the trade under the contract description, the Products were not of fair or average quality within the description, and the Products were unfit for their intended and ordinary purpose because the Products manufactured, distributed, and sold by Defendant were defective in that they contained elevated levels of carcinogenic and toxic benzene, and as such are not generally recognized as safe for human use. As a result, Plaintiffs and members of the Classes did not receive the goods as impliedly warranted by Defendant to be merchantable.

61.     Plaintiffs and members of the Classes purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

62.     The Products were not altered by Plaintiffs or members of the Classes.

17

63.     The Products were defective when they left the exclusive control of Defendant.

64.     Defendant knew that the Products would be purchased and used without additional testing by Plaintiffs and members of the Classes.

65.     The Products were defectively manufactured and unfit for their intended purpose, and Plaintiffs and members of the Classes did not receive the goods as warranted.

66.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and members of the Classes have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained harmful levels of benzene and are not generally recognized as safe for human use; and (b) the Products do not have the characteristics, ingredients, uses, or benefits as promised by Defendant.

67.     On November 16, 2021, prior to filing this action, Defendant was served with a pre-suit notice letter on behalf of Plaintiffs that complied in all respects with U.C.C. §§ 2-313 and 2-607.  Plaintiffs' counsel sent Defendant a letter advising Defendant that it breached an implied warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiffs' counsel's letter is attached hereto as **Exhibit 1**.

### COUNT III
### Violation Of New York General Business Law § 349

68.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1-51 above as though fully set forth herein.

69.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Subclass against Defendant.

70.     GBL § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

71.     In its sale of goods throughout the State of New York, Defendant conducts business and trade within the meaning and intendment of GBL § 349.

72.     Plaintiffs and members of the Subclass are consumers who purchased products from Defendant for their personal use.

73.     By the acts and conduct alleged herein, Defendant has engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, misrepresenting that the Products (i) would not contain dangerously high levels of benzene, and (ii) are generally recognized as safe for human use.  Defendant also materially omitted key facts regarding the true nature of the Products, specifically that the Products contained dangerous levels of benzene, were adulterated, and was unsafe for use as an antifungal treatment.  Had Plaintiffs and members of the Subclass been apprised of these facts, they would have been aware of them and would not have purchased the Products.

74.     The foregoing deceptive acts and practices were directed at consumers.

75.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and quality of the Products to induce consumers to purchase the same.  No reasonable consumer would knowingly purchase an antifungal product that may contain high levels of a known carcinogen and reproductive toxin and that was illegal to purchase or sell.

76.     By reason of this conduct, Defendant engaged in deceptive conduct in violation of GBL § 349.

77.     Defendant's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiffs and members of Subclass have sustained from having paid for and used Defendant's Products.

78.     As a result of Defendant's violations, Plaintiffs and members of the Subclass have suffered damages because: (a) they paid a premium price in the amount of the full purchase price of the Products based on Defendant's deceptive conduct; and (b) the Products do not have the characteristics, uses, benefits, or qualities as promised.

79.     On behalf of themselves and other members of the Subclass, Plaintiffs seek to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

### COUNT IV
### Violation Of New York General Business Law § 350

80.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1-51 above as though fully set forth herein.

81.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Subclass against Defendant.

82.     GBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

83.     Pursuant to said statute, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

84.     Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of GBL § 350.

85.     Defendant's false, misleading, and deceptive statements and representations of fact were and are directed towards consumers.

86.     Defendant's false, misleading, and deceptive statements and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

87.     Defendant's false, misleading, and deceptive statements and representations of fact have resulted in consumer injury or harm to the public interest.

88.     Defendant also materially omitted key facts regarding the true nature of the Products, specifically that the Products contained dangerous levels of benzene, were adulterated, and were unsafe for use as antiperspirants and deodorants.  Had Plaintiffs and members of the Subclass been apprised of these facts, they would have been aware of them and would not have purchased the Products.

89.     As a result of Defendant's false, misleading, and deceptive statements and representations of fact, Plaintiffs and the Subclass have suffered and continue to suffer economic injury.

90.     As a result of Defendant's violations, Plaintiffs and members of the Subclass have suffered damages due to said violations because: (a) they paid a premium price in the amount of the full purchase price of the Products based on Defendant's deceptive conduct; and (b) the Products do not have the characteristics, uses, benefits, or qualities as promised.

91.     On behalf of themselves and other members of the Subclass, Plaintiffs seek to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT V
### Fraud

92.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1-51 above as though fully set forth herein.

93.     Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendant.

94.     Defendant made fraudulent misrepresentations to Plaintiffs and members of the Classes regarding the Products, specifically that the Products contained only the active and inactive ingredients stated on the label, and not harmful impurities such as benzene.  Defendant also materially omitted facts from Plaintiffs and members of the Classes, including that the Products in fact contained harmful levels of benzene.

95.     Defendant had a duty to disclose material facts to Plaintiffs and the Classes given its relationship as contracting parties and intended users of the Products.  Defendant also had a duty to disclose material facts to Plaintiffs and the Classes, namely that it was in fact manufacturing, distributing, and selling harmful products unfit for human use, because Defendant had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

96.     Defendant knew or should have known that the Products were contaminated with benzene, but continued to manufacture them nonetheless.  Defendant was required to engage in impurity testing to ensure that harmful impurities such as benzene were not present in the Products.  Had Defendant undertaken proper testing measures, it would have been aware that the Products contained dangerously high levels of benzene.  During this time, Plaintiffs and members of the Classes were using the Products without knowing it contained dangerous levels of benzene.

97.     Defendant failed to discharge its duty to disclose these material facts.

98.     In so failing to disclose these material facts to Plaintiffs and the Classes, Defendant intended to hide from Plaintiffs and the Classes that they were purchasing and using

the Products with harmful defects that were unfit for human use, and thus acted with scienter and/or an intent to defraud.

99.     Plaintiffs and the Classes reasonably relied on Defendant's failure to disclose insofar as they would not have purchased the defective Products manufactured and sold by Defendant had they known they contained unsafe levels of benzene.

100.     As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiffs and the Classes suffered damages in the amount of monies paid for the defective Products.

101.     As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## COUNT VI
### Unjust Enrichment

102.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth in paragraphs 1-51 above as though fully set forth herein.

103.     Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendant.

104.     Plaintiffs and the Classes conferred a benefit on Defendant in the form of monies paid to purchase Defendant's defective and worthless Products.

105.     Defendant voluntarily accepted and retained this benefit.

106.     Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use, it would be unjust and inequitable for Defendant to retain the benefit without paying the value thereof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendant as follows:

23

(a)  For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as the representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel;

(b)  For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c)  For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)  For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)  For prejudgment interest on all amounts awarded;

(f)  For an order of restitution and all other forms of equitable monetary relief;

(g)  For injunctive relief as pleaded or as the Court may deem proper; and

(h)  For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated:  November 18, 2021                 Respectfully Submitted,

**BURSOR & FISHER, P.A**

By:   */s/ Andrew J. Obergfell*
           Andrew J. Obergfell

Andrew J. Obergfell
Max S. Roberts
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail:  aobergfell@bursor.com
             mroberts@bursor.com

24

**BURSOR & FISHER, P.A.**
Sarah N. Westcot*
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: swestcot@bursor.com

*Pro Hac Vice* Application Forthcoming

*Attorneys for Plaintiffs*