**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OTTO DELCID, LUZ ROMAN, MINA KALLAMNI, MARY MOLINA, CARLO GARCIA, and ANDREA FAHEY on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>     v.<br><br>TCP HOT ACQUISITION LLC and IDELLE LABS, LTD,<br><br><br>                              Defendants. | Case No. 1:21-cv-09569-VSB<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Otto Delcid, Luz Roman, Mina Kallamni, Mary Molina, Carlo Garcia, and Andrea Fahey ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendants TCP HOT Acquisition LLC ("TCP") and Idelle Labs, Ltd ("Idelle") (collectively, "Defendants"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

**NATURE OF THE ACTION AND FACTS COMMON TO ALL CLAIMS**

1.     This is a class action lawsuit regarding Defendants' manufacturing, distribution, and sale of Sure and Brut brand antiperspirant aerosol and spray products (the "Products") that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.      These Products are not designed to contain benzene, and in fact no amount of benzene is acceptable in antiperspirant sprays such as the Products manufactured and sold by

1

Defendants.  Further, although Defendants list both active and inactive ingredients on the Products' labels, Defendants fail to disclose that the Products contain benzene.

3.    The presence of benzene in the Products renders them adulterated and misbranded, and therefore illegal to sell under both federal and state law.  As a result, the Products are unsafe and illegal to sell under federal law, and therefore worthless.  *See* 21 U.S.C. §§ 331(a), 352; *see also Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021).

4.    Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.  The Department of Health and Human Services has determined that benzene causes cancer in humans.  Likewise, the Food and Drug Administration ("FDA") lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."  Benzene is associated with blood cancers such as leukemia.[1]  A study from 1939 on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe,"[2]  which is a comment reiterated in a 2010 review of benzene research specifically stating: "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[3]

5.    According to the American Cancer Society:

---

[1] National Cancer Institute, Cancer-Causing Substances, Benzene. https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

[2] Hunter, F.T. (1939). Chronic Exposure to Benzene (Benzol). II. The Clinical Effects. *Journal of Industrial Hygiene and Toxicology*. 1939 Vol.21 pp.331-54, https://www.cabdirect.org/cabdirect/abstract/19402700388.

[3] Smith, Martyn T. (2010). Advances in Understanding Benzene Health Effects and Susceptibility. *Annual Review of Public Health*. 2010 Vol. 31:133-148, https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

> IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[4]

6.    Moreover, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[5]

7.    According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, **skin absorption**, ingestion, **skin** and/or eye contact."[6]  Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

8.    On November 3, 2021, Valisure, an online pharmacy registered with the FDA, "detected high levels of benzene and other contaminants in specific batches of body spray products, some of which contain active pharmaceutical ingredients aluminum chlorohydrate or aluminum sesquichlorohydrate."[7]

9.    Valisure tested the Products manufactured by Defendants, which were found to contain as much as 11.1 parts per million of benzene[8]:

---

[4] American Cancer Society. Benzene and Cancer Risk (January 5, 2016) (https://www.cancer.org/cancer/cancer-causes/benzene.html)

[5] Centers for Disease Control and Prevention, Facts About Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[6] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html.

[7] VALISURE, VALISURE CITIZEN PETITION ON BENZENE IN BODY SPRAY PRODUCTS, Nov. 3, 2021, https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Body-Spray-v4.0-3.pdf (the "Valisure Petition"), at 1.

[8] *Id.* at 13.

| Brand | UPC | Lot | Expiration | Description | Average ppm |
|-------|-----|-----|------------|-------------|-------------|
| Sure | 88348002278 | (L)21175 | 05/2023 | Lasts All Day, Unscented, Aerosol | 11.1 |
| Brut | 827755070108 | (L)21155 | 05/2023 | Classic, 24 Hr Protection | 4.13 |
| Sure | 883484002278 | 21172 | 05/2023 | Lasts All Day, Unscented, Aerosol | 3.59 |
| Sure | 883484002278 | (L)21099 | 03/2023 | Lasts All Day, Unscented, Aerosol | 2.36 |
| Brut | 827755070085 | (L)21167 | 05/2023 | Classic, 24 Hr Protection | 2.34 |

10.     The FDA does state that if the use of benzene is "**unavoidable** in order to produce a drug product with a significant therapeutic advance," then the drug product may contain up to 2 ppm of benzene.[9]   However, many of Defendants' Products that were tested contain levels of benzene above this amount.  Regardless, according to Valisure, "[b]ecause many of the body spray products Valisure tested did not contain detectable levels of benzene, it does not appear that

---

[9] *Id.* at 1 (emphasis added).

benzene use is unavoidable for their manufacture, and considering the long history and widespread use of these products, it also does not appear that they currently constitute a significant therapeutic advance."[10]   Accordingly, **any** level of benzene in Defendants' Products is unacceptable and therefore renders the Products adulterated, misbranded, unsafe, and worthless.

11.    Defendants did not disclose the actual or potential presence of benzene in its antiperspirant products on the Products' labeling, or in any advertising or website promoting the Products.  Defendants did not disclose the presence of benzene in the Products to Plaintiffs or Class members at the point of sale or at any time before the point of sale.

12.    Antiperspirant body sprays are considered over-the-counter ("OTC") drugs that are regulated by the United States Food & Drug Administration ("FDA") pursuant to the federal Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, as well as analogous state statutes and regulations.

13.    As OTC drug products regulated by the FDA, the Products must be both safe and effective and are subject to federal current Good Manufacturing Practices ("cGMP") regulations and the FDCA's state-law analogues.  These cGMP regulations require OTC medications like the Products to meet safety, quality, purity, identity, and strength standards.  *See* 21 U.S.C. § 51(a)(2)(B).  Federal and state regulatory regimes require that labeling for OTC products identify each active and inactive ingredient.[11]  21 C.F.R. 201.66 establishes labeling requirements for OTC products and defines an inactive ingredient as "any component other than an active ingredient." An "active ingredient" is "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect

---

[10] *Id.* at 1-2.

[11] https://www.fda.gov/media/72250/download.

the structure or any function of the body of humans.  **The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form** intended to furnish the specified activity or effect." (Emphasis added).

14.     21 C.F.R. § 210.1(a) states that the cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess."  In other words, entities at all phases of the design, manufacture, and distribution chain are bound by these requirements.

15.     The FDA's cGMP regulations are found in 21 C.F.R. Parts 210 and 211.  These detailed regulations set forth minimum standards regarding: organization and personnel (Subpart B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug product containers and closures (Subpart E); production and process controls (Subpart F); packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products (Subpart K). The FDA has worldwide jurisdiction to enforce these regulations if the facility is making drugs intended to be distributed in the United States.

16.     Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" or "misbranded" and may not be distributed or sold in the United States.  *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B).  States have enacted laws adopting or mirroring these federal standards.

17.     FDA regulations require a drug product manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

18.     A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity." 21 C.F.R. § 211.160.

19.     "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194.

20.     Defendants disregarded the cGMPs outlined above.  As a manufacturer, distributor, and seller of an OTC drug product, Defendants had and has a duty to ensure that its Products did not contain excessive (or any) levels of benzene, including through regular testing.  But based on Valisure's testing results set forth above, Defendants made no reasonable effort to test its Products for benzene or other impurities.  Nor did it disclose to Plaintiffs or any other consumers in any product advertising, labeling, packaging, or marketing that its antiperspirant products contained benzene, let alone at levels that are many multiples of the emergency, interim limit set by the FDA. To the contrary, Defendants represented and warranted, expressly and impliedly, that the Products were of merchantable quality, complied with federal and state law, and did not contain carcinogens, reproductive toxins, or other impurities such as benzene.

21.     If Defendants had not routinely disregarded the FDA's cGMPs, or had fulfilled their quality assurance obligations, Defendants would have identified the presence of the benzene contaminant almost immediately.

22.     Further, had Defendants adequately tested its Products for benzene and other carcinogens, reproductive toxins, and impurities, it would have discovered that its Products contained benzene at levels above the FDA's limit (to the extent even applicable), making those products ineligible for distribution, marketing, and sale.

23.     Accordingly, Defendants knowingly, or at least negligently, introduced contaminated, adulterated, and/or misbranded Products containing dangerous amounts of benzene into the U.S. market.

24.     Defendants also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."

25.     The presence of benzene—and Defendants' failure to comply with cGMPs—renders the Products both adulterated and misbranded under the FDCA.  The Products are adulterated because they are "drug[s] and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."  21 U.S.C.  § 351(a)(1).

26.     The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose the presence of benzene.  21 U.S.C. § 352(a)(1).

27.     Under federal law, a product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold.  21 U.S.C. § 331(a).  Adulterated and misbranded products thus have no economic value and are legally worthless.

28.     Defendants specifically manufacture, sell, and distribute the Products using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers.

29.     Defendants' marketing and advertising campaign includes the one place that every consumer looks when purchasing a product—the packaging and labels themselves. Consumers expect the ingredient listing on the packaging and labels to accurately disclose the ingredients within the Products.

30.     However, Defendants' advertising and marketing campaign is false, deceptive, and misleading because the Products contain benzene, which Defendants do not list or mention anywhere on the Products' packaging or labeling.

31.     Plaintiffs and Class members relied on Defendants' misrepresentations and omissions of what is in the Products when they purchased them.

32.     When Plaintiffs purchased Defendants' Products, Plaintiffs did not know, and had no reason to know, that Defendants' Products were adulterated and misbranded and thus unlawful to sell or purchase as set forth herein.  Not only would Plaintiffs not have purchased Defendants' Products at all had they known the Products contained benzene, they would not have been capable of purchasing them if Defendants had done as the law required and tested those products for benzene and other carcinogens, reproductive toxins, and impurities.

33.     Moreover, no reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (even assuming those allowances apply to Defendants' products).

34.     Thus, if Plaintiffs and Class members had been informed that Defendants' Products contained or may contain benzene, they would not have purchased or used the Products at all, or would have paid significantly less for the Products, making such omitted facts material to them.

35.     Plaintiffs and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene, and Defendants have failed to warn consumers of this fact.   Such illegally sold products are worthless and have no value.   *See Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021) ("This Court finds that contaminated drugs are economically worthless at the point of sale by virtue of the dangerousness caused by their contamination, regardless whether the sold VCDs actually achieved the medical purpose of lowering blood pressure.   Put differently, contaminated drugs, even if medically efficacious for their purpose, cannot create a benefit of the bargain because the contaminants, and their dangerous effects, were never bargained for.").

36.     Plaintiffs and Class members bargained for antiperspirant products free of contaminants and dangerous substances and were deprived the basis of their bargain when Defendants sold them products containing the dangerous substance benzene, which rendered the Products unmerchantable and unfit for use.

37.     Plaintiffs and Class members are further entitled to damages for the monies paid to purchase the Products, statutory and punitive damages, attorneys' fees and costs, and injunctive relief.

38.     Plaintiffs bring this action on behalf of themselves and the Class for equitable relief and to recover damages and restitution for: (i) breach of express warranty; (ii) breach of implied warranty; (iii) violation of New York General Business Law ("GBL") § 349; (iv) violation of GBL § 350; (v) violation of California's Consumer Legal Remedies Act ("CLRA") Cal. Civ. Code §§ 1750, *et seq.*; (vi) violation of California's False Advertising Law ("FAL"); (vii) violation of California's Unfair Competition Law ("UCL"); (viii) violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 *et seq.*; (ix) fraud; (x) unjust enrichment; and (xi) medical monitoring.

## PARTIES

39.     Plaintiff Otto Delcid is a resident of Hamilton Heights, New York and has an intent to remain there, and is therefore a domiciliary of New York.  In or about September 2021, Mr. Delcid purchased a canister of Defendants' Brut Classic – 24 Hour Protection (the "Brut Product") from a Rite Aid in Manhattan.  When purchasing the Brut Product, Mr. Delcid reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Brut Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell.  Mr. Delcid relied on these representations and warranties in deciding to purchase the Brut Product manufactured by Defendants, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Brut Product from Defendants if he had known that it was not, in fact, properly manufactured, free from defects, safe for its intended use, adulterated and

misbranded, and legal to sell.  Mr. Delcid's Brut Product was contaminated with benzene, therefore rendering it improperly manufactured, defective, not safe for its intended use, adulterated and misbranded, and illegal to sell.

40.     Plaintiff Luz Roman is a resident of The Bronx, New York and has an intent to remain there, and is therefore a domiciliary of New York.  In or about April 2020, Ms. Roman purchased a canister of Defendants' Brut Classic – 24 Hour Protection from a Dollar General in The Bronx.  When purchasing the Brut Product, Ms. Roman reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Brut Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell.  Ms. Roman relied on these representations and warranties in deciding to purchase the Brut Product manufactured by Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Brut Product from Defendants if she had known that it was not, in fact, properly manufactured, free from defects, safe for its intended use, adulterated and misbranded, and legal to sell.  Ms. Roman's Brut Product was contaminated with benzene, therefore rendering it improperly manufactured, defective, not safe for its intended use, adulterated and misbranded, and illegal to sell.

41.     Plaintiff Mina Kallamni is a resident of New York and has an intent to remain there, and is therefore a domiciliary of New York.  Ms. Kallamni purchased a canister of Defendants' Sure – Lasts All Day, Unscented, Aerosol (the "Sure Product") in New York.  When purchasing the Sure Product, Ms. Kallamni reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Sure Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal

to sell.  Ms. Kallamni relied on these representations and warranties in deciding to purchase the Sure Product manufactured by Defendants, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Sure Product from Defendants if she had known that it was not, in fact, properly manufactured, free from defects, safe for its intended use, adulterated and misbranded, and legal to sell.  Ms. Kallamni's Sure Product was contaminated with benzene, therefore rendering it improperly manufactured, defective, not safe for its intended use, adulterated and misbranded, and illegal to sell.

42.     Plaintiff Mary Molina is a resident of Pine Grove, California and has an intent to remain there, and is therefore a domiciliary of California. In or about April 2021, Ms. Molina purchased a canister of Defendants' Sure – Lasts All Day, Unscented, Aerosol. Ms. Molina has purchased the Product regularly for many years, several times each year. Ms. Molina purchases the Sure Antiperspirant at various locations including the Safeway, Raley's, CVS, and Walmart in Jackson, California, the Rite Aid in Citrus Heights, California, the Target in Folsom, California, and the Target in El Dorado Hills, California. When purchasing the Product, Ms. Molina reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Sure Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell.  Ms. Molina relied on these representations and warranties in deciding to purchase the Sure Product manufactured by Defendants, and these representations and warranties were part of the basis of the bargain, in that they would not have purchased the Sure Product from Defendants if they had known that it was not, in fact, properly manufactured, free from defects, safe for its intended use, adulterated and misbranded, and legal to sell.  Ms. Molina's Sure Product was contaminated with benzene,

therefore rendering it improperly manufactured, defective, not safe for its intended use, adulterated and misbranded, and illegal to sell.

43.     Plaintiff Carlo Garcia is a resident of Sanger, California and has an intent to remain there, and is therefore a domiciliary of California. Mr. Garcia purchased a canister of Defendants' Brut Classic – 24 Hour Protection (the "Brut Product") on July 31, 2020 online at Amazon.com for delivery to his home in Sanger, California. When purchasing the Brut Product, Mr. Garcia reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Brut Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell.  Mr. Garcia relied on these representations and warranties in deciding to purchase the Brut Product manufactured by Defendants, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Brut Product from Defendants if he had known that it was not, in fact, properly manufactured, free from defects, safe for its intended use, adulterated and misbranded, and legal to sell.  Mr. Garcia's Brut Product was contaminated with benzene, therefore rendering it improperly manufactured, defective, not safe for its intended use, adulterated and misbranded, and illegal to sell.

44.     Plaintiff Andrea Fahey is a resident of Sebastian, Florida and has an intent to remain there, and is therefore a domiciliary of Florida.  In or about September 2021, Ms. Fahey purchased a canister of Defendants' Sure – Lasts All Day, Unscented, Aerosol from a Walmart in Florida. When purchasing the Product, Ms. Fahey reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Sure Product was properly manufactured, free from defects, safe for its intended use, not adulterated or misbranded, and legal to sell.  Ms. Fahey relied on these representations and warranties in deciding to purchase

the Sure Product manufactured by Defendants, and these representations and warranties were part of the basis of the bargain, in that they would not have purchased the Sure Product from Defendants if they had known that it was not, in fact, properly manufactured, free from defects, safe for its intended use, adulterated and misbranded, and legal to sell.  Ms. Fahey's Sure Product was contaminated with benzene, therefore rendering it improperly manufactured, defective, not safe for its intended use, adulterated and misbranded, and illegal to sell.

45.     Defendant TCP HOT Acquisition LLC is a limited liability company incorporated in New York with its principal place of business in New York.  Defendant TCP manufactures, distributes, and sells the Products throughout the United States and the States of New York and Florida.  The Products, including the adulterated Products purchased by Plaintiffs and members of the putative Classes, are available at retail stores throughout New York, Florida, and the United States.

46.     Defendant Idelle Labs Ltd is a corporation formed under the laws of Texas with its principal place of business in Texas.  Defendant Idelle manufactures, distributes, and sells the Products throughout the United States and the States of New York and Florida.  The Products, including the adulterated Products purchased by Plaintiffs and members of the putative Classes, are available at retail stores throughout New York, Florida, and the United States.

## **JURISIDICTION AND VENUE**

47.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

48.     Defendant TCP is an "unincorporated association" under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), and Defendant TCP is therefore "a citizen of the State where it has its principal place of business and the State under whose laws it is organized." *See* 28 U.S.C. § 1332(d)(10).

49.     This Court has personal jurisdiction over Defendants because Plaintiffs Delcid, Roman, and Kallamni purchased the Products in this District.  Further, Defendants have consented to personal jurisdiction as to the claims of Plaintiffs Molina, Garcia, and Fahey, but without prejudice as to all other rights, defenses, and arguments.

50.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.   Further, Defendants have consented to venue as to the claims of Plaintiffs Molina, Garcia, and Fahey, but without prejudice as to all other rights, defenses, and arguments.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs seek to represent a class defined as all persons in the United States who purchased the Products (the "Class").

52.     Plaintiffs Delcid, Roman, and Kallamni also seek to represent a subclass of all Class members who purchased the Products in New York (the "New York Subclass").

53.     Plaintiffs Molina and Garcia also seek to represent a subclass of all Class members who purchased the Products in California (the "California Subclass").

54.     Plaintiff Fahey also seeks to represent a subclass of all Class members who purchased the Products in Florida (the "Florida Subclass") (collectively with the New York Subclass and California Subclass, the "Subclasses").

55.     The Class and Subclasses are collectively referred to as the "Classes."

56.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

57.     Specifically excluded from the Classes are Defendants, Defendants' officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendants, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

58.     **Numerosity.**  The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed members are unknown to Plaintiffs, the true number of members of the Classes are known by Defendants.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

59.     **Typicality.**  The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all members of the Classes, purchased the Brut Products, which were worthless due to the presence of benzene, a harmful and carcinogenic chemical impurity.  The representative Plaintiffs, like all members of the Classes, have been damaged by Defendants' misconduct in the very same way as the members of the Classes.  Further, the factual bases of Defendants' misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

60.     **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

(a)   whether the Products manufactured by Defendants contain dangerously high levels of benzene, thereby breaching the express and implied warranties made by Defendants and making the Products unfit for human use and therefore unfit for their intended purpose;

(b)   whether Defendants knew or should have known the Products contained elevated levels of benzene prior to selling them, thereby constituting fraud and/or fraudulent concealment;

(c)   whether Defendants are liable to Plaintiffs and the Classes for unjust enrichment;

(d)   whether Defendants are liable to Plaintiffs and the Classes for fraud;

(e)   whether Plaintiffs and the Classes have sustained monetary loss and the proper measure of that loss;

(f)   whether Plaintiffs and the Classes are entitled to declaratory and injunctive relief;

(g)   whether Plaintiffs and the Classes are entitled to restitution and disgorgement from Defendants; and

(h)   whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

61.    **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs have retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes.  Plaintiffs have no interests that are antagonistic to those of the Classes.

62.    **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of their claims against Defendants.  It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

63.    In the alternative, the Classes may be certified because:

(a)    the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendants;

(b)    the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)     Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

### COUNT I
**Breach Of Express Warranty**

64.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

65.     Plaintiffs bring this claim individually and behalf of the members of the proposed Classes against Defendants.

66.     In connection with the sale of the Products, Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, issued written warranties by representing that the Products were antiperspirants and deodorants that contained only those active and inactive ingredients listed on the Products' labels.  Those active and inactive ingredients do not include benzene, a known human carcinogen dangerous to humans.

67.     As a direct and proximate cause of Defendants' breach of express warranty, Plaintiffs and the Classes have been injured and harmed because they would not have purchased the Products on the same terms if they knew that the Products contained benzene and are not generally recognized as safe.

68.     On November 11, 2021 and November 23, 2021, prior to filing this action, Defendants were served with pre-suit notice letters on behalf of Plaintiffs that complied in all respects with U.C.C. §§ 2-313 and 2-607.  Plaintiffs' counsel sent Defendants letters advising Defendants that they breached an express warranty and demanded that Defendants cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true

and correct copy of Plaintiffs' counsel's letters are attached hereto as **Exhibit 1**.

## COUNT II
### Breach of Implied Warranty

69.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

70.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendants.

71.     Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers, impliedly warranted that the Products (i) would not contain elevated levels of benzene and (ii) are generally recognized as safe for human use.

72.     Defendants breached the warranty implied in the contract for the sale of the defective Products because they could not pass without objection in the trade under the contract description, the Products were not of fair or average quality within the description, and the Products were unfit for their intended and ordinary purpose because the Products manufactured, distributed, and sold by Defendants were defective in that they contained elevated levels of carcinogenic and toxic benzene, and as such are not generally recognized as safe for human use. As a result, Plaintiffs and members of the Classes did not receive the goods as impliedly warranted by Defendants to be merchantable.

73.     Plaintiffs and members of the Classes purchased the Products in reliance upon Defendants' skill and judgment and the implied warranties of fitness for the purpose.

74.     The Products were not altered by Plaintiffs or members of the Classes.

75.     The Products were defective when they left the exclusive control of Defendants.

76.     Defendants knew that the Products would be purchased and used without additional testing by Plaintiffs and members of the Classes.

77.     The Products were defectively manufactured and unfit for their intended purpose, and Plaintiffs and members of the Classes did not receive the goods as warranted.

78.     As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiffs and members of the Classes have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained harmful levels of benzene and are not generally recognized as safe for human use; and (b) the Products do not have the characteristics, ingredients, uses, or benefits as promised by Defendants.

79.     On November 11, 2021 and November 23, 2021, prior to filing this action, Defendants were served with pre-suit notice letters on behalf of Plaintiffs that complied in all respects with U.C.C. §§ 2-313 and 2-607.  Plaintiffs' counsel sent Defendants letters advising Defendants that they breached an implied warranty and demanded that Defendants cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiffs' counsel's letters are attached hereto as **Exhibit 1**.

### COUNT III
### Violation Of New York General Business Law § 349

80.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

81.     Plaintiffs Delcid, Roman, and Kallamni bring this claim individually and on behalf of the members of the proposed New York Subclass against Defendants.

82.     GBL § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

83.     In its sale of goods throughout the State of New York, Defendants conduct business and trade within the meaning and intendment of GBL § 349.

84.     Plaintiffs Delcid, Roman, and Kallamni and members of the New York Subclass

are consumers who purchased products from Defendants for their personal use.

85.     By the acts and conduct alleged herein, Defendants have engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, misrepresenting that the Products (i) would not contain dangerously high levels of benzene, and (ii) are generally recognized as safe for human use.  Defendants also materially omitted key facts regarding the true nature of the Products, specifically that the Products contained dangerous levels of benzene, were adulterated, and was unsafe for use as an antiperspirant.  Had Plaintiffs Delcid, Roman, and Kallamni and members of the New York Subclass been apprised of these facts, they would have been aware of them and would not have purchased the Products.

86.     The foregoing deceptive acts and practices were directed at consumers.

87.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and quality of the Products to induce consumers to purchase the same.  No reasonable consumer would knowingly purchase an antiperspirant product that may contain high levels of a known carcinogen and reproductive toxin and that was illegal to purchase or sell.

88.     By reason of this conduct, Defendants engaged in deceptive conduct in violation of GBL § 349.

89.     Defendants' actions are the direct, foreseeable, and proximate cause of the damages that Plaintiffs Delcid, Roman, and Kallamni and members of the New York Subclass have sustained from having paid for and used Defendants' Products.

90.     As a result of Defendants' violations, Plaintiffs Delcid, Roman, and Kallamni and members of the New York Subclass have suffered damages because: (a) they paid a premium price in the amount of the full purchase price of the Products based on Defendants' deceptive conduct;

and (b) the Products do not have the characteristics, uses, benefits, or qualities as promised.

91.     On behalf of themselves and other members of the New York Subclass, Plaintiffs Delcid, Roman, and Kallamni seek to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT IV
## Violation Of New York General Business Law § 350

92.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

93.     Plaintiffs Delcid, Roman, and Kallamni bring this claim individually and on behalf of the members of the proposed New York Subclass against Defendants.

94.     GBL § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

95.     Pursuant to said statute, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

96.     Based on the foregoing, Defendants have engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of GBL § 350.

97.     Defendants' false, misleading, and deceptive statements and representations of fact were and are directed towards consumers.

98.     Defendants' false, misleading, and deceptive statements and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

99.     Defendants' false, misleading, and deceptive statements and representations of fact have resulted in consumer injury or harm to the public interest.

100.    Defendants also materially omitted key facts regarding the true nature of the Products, specifically that the Products contained dangerous levels of benzene, were adulterated, and were unsafe for use as antiperspirants and deodorants.  Had Plaintiffs Delcid, Roman, and Kallamni and members of the New York Subclass been apprised of these facts, they would have been aware of them and would not have purchased the Products.

101.    As a result of Defendants' false, misleading, and deceptive statements and representations of fact, Plaintiffs Delcid, Roman, and Kallamni and the New York Subclass have suffered and continue to suffer economic injury.

102.    As a result of Defendants' violations, Plaintiffs Delcid, Roman, and Kallamni and members of the New York Subclass have suffered damages due to said violations because: (a) they paid a premium price in the amount of the full purchase price of the Products based on Defendants' deceptive conduct; and (b) the Products do not have the characteristics, uses, benefits, or qualities as promised.

103.    On behalf of themselves and other members of the New York Subclass, Plaintiffs Delcid, Roman, and Kallamni seek to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT V
### California's Consumer Legal Remedies Act ("CLRA")
### Cal. Civ. Code §§ 1750, *et seq.*

104.    Plaintiffs repeat and re-allege the allegations above as if set forth herein.

105.    Defendants' conduct constitutes violations under California's Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq.. The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

106.    Defendants' conduct falls within the meaning of this statute because they caused transactions to occur resulting in the sale or lease of goods or services to consumers – namely, the sale of the Products to Plaintiff Molina, Plaintiff Garcia, and the California Subclass. Deodorant and antiperspirant sprays are considered goods within the meaning of the statute under Civil Code § 1761(a) and Defendants' sale of the Products is considered a service under Civil Code § 1761(b).

107.    Plaintiff Molina, Plaintiff Garcia, and Class Members are consumers pursuant to the CLRA.

108.    Each Defendant is a person pursuant to the CLRA.

109.    The Products are goods pursuant to the CLRA.

110.    Defendants violated the CLRA by way of the following provisions:

- In violation of Civil Code § 1770(a)(5), Defendants represented (and continue to represent) that their goods have characteristics which they do not have – that, in exchange for each payment, Plaintiffs and the members of the California Subclass receive antiperspirant which is functioning as intended and which is not contaminated with benzene;

- In violation of Civil Code § 1770(a)(14), Defendants represented (and continue to represent) that a consumer has rights, remedies and/or obligations which they did not have – that Plaintiffs and members of the California Subclass receive antiperspirant which is functioning as intended and which is not contaminated with benzene, and that Defendants are capable of correcting defects when they are not;

111.    Defendants also engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code § 1770(a)(5) and (a)(7) when they represented through their advertising, warranties, and other express representations that the Products have benefits or characteristics that they did not actually have, namely that the Products were safe to use and failing to disclose that the Products were contaminated with the carcinogen benzene.

112.    Defendants are aware that their representations are false and misleading – specifically, the Defendants continued to sell the Products into the stream of commerce even after

they had knowledge that the Products were contaminated with benzene.

113.    Plaintiff Molina, Plaintiff Garcia, and the California Subclass have suffered injury-in-fact and actual damages resulting from Defendants' omissions and misrepresentations because Defendants knew that the Products were contaminated with benzene.

114.    Contemporaneously with the filing of this Complaint, Plaintiffs and Class Members put Defendants on written notice of their claims arising from violations of numerous provisions of California law, including the California Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1770, et seq., as well as other causes of action.  Plaintiffs will amend their Complaint to add claims for monetary damages if Defendants fail to take the corrective actions.

115.    Plaintiff's declaration stating facts showing that venue in this District is proper pursuant to Cal. Civ. Code § 1780(c) is attached hereto as **Exhibit 2**.

116.    In accordance with Civil Code § 1780(a), Plaintiffs and the other California Subclass Members seek injunctive and equitable relief for Defendants' violations of the CLRA, including an injunction to enjoin Defendants from continuing their deceptive advertising and sales practices.

117.    Pursuant to California Civil Code § 1780(a)(1)-(5) and § 1780(e), Plaintiffs seek an order enjoining Defendants from the unlawful practices described above, a declaration that Defendants' conduct violates the Consumers Legal Remedies Act, reasonable attorneys' fees and litigation costs, and any other relief the Court deems proper under the CLRA.

118.    Plaintiffs and the California Subclass Members' injuries were proximately caused by Defendants' fraudulent business practices.

119.    Therefore, Plaintiffs and California Subclass Members are entitled to relief under the CLRA.

<u>**COUNT VI**</u>
**California's False Advertising Law ("FAL"),**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***

120.     Plaintiffs repeat and re-allege the allegations above as if set forth herein.

121.     California's False Advertising Law (the "FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

122.     Defendants advertised and promoted the Products by relying on the trust and brand loyalty customers had for their Brut and Sure brands and representing that the Products were safe for personal use, when in reality the Products were contaminated with benzene.  Defendants' advertisements and inducements were made in and originated from California and fall within the definition of advertising as contained in Bus. & Prof. Code § 17500, *et seq.* in that Defendants' representations were intended to induce consumers to purchase the Products. Defendants knew that those statements were false and misleading as it knew or should have known through the exercise of reasonable care that the Products were contaminated with benzene.

123.     Plaintiffs have standing to pursue claims under the FAL as they reviewed and relied on Defendants' packaging, advertising, representations, and marketing materials regarding the Products, when selecting and purchasing the Products.

124.     Plaintiffs purchased the Products in reliance on the statements made in Defendants' advertising and marketing materials and Defendants' omissions and concealment of material facts regarding the Products.

125.     Plaintiffs and the California Subclass lost money or property as a result of Defendants' FAL violations because (a) they would not have purchased Defendants' Products absent Defendants' representations that the Products were safe and effective; (b) they would not have purchased the Products for the same price absent Defendants' misrepresentations; and (c) Defendants' Products did not have the characteristics, benefits, or quantities as promised.

126.     Plaintiffs seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendants and by means of its deceptive or misleading representations, including monies already obtained from Plaintiffs as provided for by the California Business and Professions Code § 17500.

**COUNT VII**
**California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

127.     Plaintiffs repeat and re-allege the allegations above as if set forth herein.

128.     Each Defendant is a person pursuant to the UCL.

129.     Defendants engaged in unlawful, fraudulent, and unfair business practices.

130.     Defendants' conduct was unlawful because it violates the CLRA, the FAL, tort law, and contract law.

131.     Defendants' conduct is fraudulent because they continued to represent that their goods were fit for their intended use when they knew that the Products were contaminated with benzene in an attempt to get consumers to continue to buy the Products; and, Defendants' conduct is fraudulent because they did not disclose to the buyers that the Products were contaminated with

benzene and continue to conceal the fact of this contamination in an attempt to keep consumers from seeking refunds or seeking other redress, so they would not bear the costs of the defect and any damage they may have caused.

132.    Defendants' conduct constitutes an unfair business practice – under the UCL, a business practice is considered to be "unfair" if the conduct alleged is immoral, unethical, oppressive, or substantially injurious to consumers; as well as if the conduct causing alleged injury which is not outweighed by benefits to other consumers or to competition, and that the injury is of a type which the consumer could not have avoided.

133.    Defendants' behavior is immoral, unethical, oppressive and injurious to consumers because they are profiting from concealing the presence of benzene in the Products, which are still being sold to this day.

134.    Defendants' retention of profits from the aforementioned conduct does not outweigh the economic harm that said retention imposes on consumers. The lone party that benefits is the Defendants – their conduct also harms competition, who would otherwise be the recipient of the business that Defendants acquired using omissions and misrepresentations.

135.    Plaintiffs and the California Subclass Members had no way of knowing that Defendants were selling defective products.

136.    The above acts of Defendants in disseminating said misleading and deceptive statements to consumers throughout the State of California, including to Plaintiffs and those similarly situated, were and are likely to deceive reasonable consumers by obfuscating the true defective nature of the Products.

137.    As a result of Defendant's above unlawful, unfair and fraudulent acts and practices, Plaintiffs, on behalf of themselves and all others similarly situated, and as appropriate, on behalf

of the general public, seeks injunctive relief prohibiting Defendants from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendants' wrongful conduct to the fullest extent permitted by law.

138.    Mislabeled products cannot legally be manufactured, advertised, distributed, or sold. Thus, the Products have no economic value and are worthless as a matter of law, and purchasers of the Products are entitled to a restitution refund of the purchase price of the Products.

139.    Therefore, Plaintiffs and the California Subclass Members are entitled to relief under the UCL.

**COUNT VIII**
**Violation Of The Florida Deceptive And Unfair Trade Practices Act,**
**Fla. Sta. §§ 501.201,** *et seq.*

140.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

141.    Plaintiff Fahey brings this claim individually and on behalf of the members of the proposed Florida Subclass against Defendants.

142.    FDUTPA renders unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce.  Fla. Stat. § 501.204.

143.    Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

144.    FDUPTA can be violated in two ways, both of which are relevant to this case.  First,

Defendants have committed a "traditional" violation of FDUPTA by engaging in unfair and/or deceptive acts and practices which caused injury to Plaintiff Fahey and members of the Florida Subclass.

145.    Second, Defendants have committed a *per se* violation of FDUPTA predicated on a violation of the FDCA.  Specifically, by selling adulterated and misbranded Products which is *per se* illegal in violation of 21 U.S.C. § 351 and 21 U.S.C. § 352 of the FDCA, and because the FDCA is designed to protect consumers from harmful and dangerous drugs, Defendants have committed *per se* violations of FDUPTA.  Fla. Stat. § 501.203(3)(c) (explaining that a FDUPTA violation may be based on "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.").

146.    While FDUPTA does not define "deceptive" or "unfair," Florida courts have looked to the Federal Trade Commission's interpretations for guidance.  "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."  *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015) (internal quotation marks and citation omitted).  Courts define a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers.  *Fed. Trade Comm'n v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016).  Courts define an "unfair trade practice" as any act or practice that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Kenneth F. Hackett & Assocs., Inc. v. GE Capital Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010).

147.    Defendants engaged in conduct that is likely to deceive members of the public.  This conduct includes representing that the Products contained only the ingredients listed in the

label, which is untrue, and failing to make any mention that the Products contained harmful levels of benzene and were adulterated and misbranded.

148.    As alleged herein, Plaintiff Fahey and members of the Florida Subclass have suffered injury in fact and lost money as a result of Defendants' conduct because they purchased the Products from Defendant in reliance on Defendants' representation that the Products were safe and effective and not contaminated with benzene, as well as Defendant's material omissions regarding the true nature of the Products.

149.    As alleged herein, Defendant's actions are deceptive and in clear violation of FDUTPA, entitling Plaintiff Fahey and the Florida Subclass to damages and relief under Fla. Stat. §§ 501.201-213.

150.    By committing the acts alleged above, Defendants engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.

151.    Defendants' conduct is substantially injurious to consumers. Consumers are purchasing and using Defendants' Products without knowledge that the Products are adulterated with a human carcinogen.  This conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid for the Products, which are contaminated with benzene, but for Defendants' false labeling, advertising, promotion, and material omissions. Thus, Plaintiff Fahey and the Florida Subclass have been "aggrieved" (*i.e.*, lost money) as required for FDUTPA standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

152.    Indeed, no benefit to consumers or competition results from Defendants' conduct. Because consumers reasonably rely on Defendants' representation of the ingredients contained on

Products' label and injury resulted from ordinary use of the Products, consumers could not have reasonably avoided such injury.

153.    Further, Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary.  Plaintiff Fahey desires to purchase Defendant's Products in the future if she can be assured that the Products are not adulterated or misbranded and meet the advertising claims on the Products' label.

### COUNT IX
**Fraud**

154.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

155.    Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendants.

156.    Defendants made fraudulent misrepresentations to Plaintiffs and members of the Classes regarding the Products, specifically that the Products contained only the active and inactive ingredients stated on the label, and not harmful impurities such as benzene.  Defendants also materially omitted facts from Plaintiffs and members of the Classes, including that the Products in fact contained harmful levels of benzene.

157.    Defendants had a duty to disclose material facts to Plaintiffs and the Classes given its relationship as contracting parties and intended users of the Products.  Defendants also had a duty to disclose material facts to Plaintiffs and the Classes, namely that it was in fact manufacturing, distributing, and selling harmful products unfit for human use, because Defendants had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

158.    Defendants knew or should have known that the Products were contaminated with benzene, but continued to manufacture the Products nonetheless.  Defendants were required to engage in impurity testing to ensure that harmful impurities such as benzene were not present in the Products.  Had Defendants undertaken proper testing measures, they would have been aware that the Products contained dangerously high levels of benzene.  During this time, Plaintiffs and members of the Classes were using the Products without knowing it contained dangerous levels of benzene.

159.    Defendants failed to discharge its duty to disclose these material facts.

160.    In so failing to disclose these material facts to Plaintiffs and the Classes, Defendants intended to hide from Plaintiffs and the Classes that they were purchasing and using the Products with harmful defects that were unfit for human use, and thus acted with scienter and/or an intent to defraud.

161.    Plaintiffs and the Classes reasonably relied on Defendants' failure to disclose insofar as they would not have purchased the defective Products manufactured and sold by Defendants had they known they contained unsafe levels of benzene.

162.    As a direct and proximate cause of Defendants' fraudulent concealment, Plaintiffs and the Classes suffered damages in the amount of monies paid for the defective Products.

163.    As a result of Defendants' willful and malicious conduct, punitive damages are warranted.

### COUNT X
**Unjust Enrichment**

164.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

165.    Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendants.

166.    Plaintiffs and the Classes conferred a benefit on Defendants in the form of monies paid to purchase Defendants' defective and worthless Products.

167.    Defendants voluntarily accepted and retained this benefit.

168.    Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use, it would be unjust and inequitable for Defendants to retain the benefit without paying the value thereof.

## COUNT XI
## MEDICAL MONITORING

169.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

170.    Plaintiff Fahey brings this claim individually and on behalf of the members of the proposed Florida Subclass against Defendants.

171.    As a proximate result of Defendants' acts and omissions, Plaintiff Fahey and members of the Florida Subclass are at a significantly increased risk of developing cancer above the normal base-level risk.

172.    As alleged above, Defendants' Products were contaminated with benzene, a known human carcinogen.

173.    Plaintiff Fahey and members of the Florida Subclass may not develop cancer for many years.

174.    Plaintiff Fahey and members of the Florida Subclass are at a significantly increased risk as they used Defendants' Products for extended periods of time, and as a result were exposed to a contaminant by having their skin absorb the Products.

36

175. Based upon the internal and external investigations now made public, Plaintiffs Fahey and members of the Florida Subclasses are at an increased risk as they were exposed to benzene. Benzene is a hazardous, life-threatening, toxic substance that is known to cause cancer in humans.

176. Plaintiff Fahey and members of the Florida Subclass are at a significantly increased risk of cancer as they were exposed to Defendants' Products in quantities, and over periods of time sufficient to establish an exposure level that is considered to be hazardous to health, greater than normal background exposure levels, and at levels considered to be sufficient to cause cancer or increase the risk of developing cancer.

177. The exposure was caused solely and proximately by Defendants' failure to adequately manufacture the Products, Defendants' failure to address discrepancies in batches of the Products during quality control testing, and Defendants' material misrepresentations and other deceptive practices in continuing to claim that the Products was safe for use.

178. Defendants had a duty to Plaintiff Fahey and members of the Florida Subclass to disclose any defect, contamination, impurity, or other potential health hazard known or discoverable by Defendants, and to ensure that the Products were safe, reliable, and non-hazardous for human use—their intended purpose.

179. As alleged above, Defendants' own negligent acts and omissions resulted a significantly increased risk of developing cancer for Plaintiff Fahey and members of the Florida Subclass. Cancer is a serious disease-causing life-threatening illness and debilitating cellular, genetic, and physical injury. Technology, analytical tools, tests and/or monitoring procedures exist and are readily available to provide for the testing and early detection of cancer in patients. These technologies, tools, tests and/or monitoring procedures are accepted and widely used by the

scientific and medical community.  These existing scientific methods include, but are not limited to, guaiac-based fecal occult blood test (gFOBT), fecal immunochemical test (FIT), FIT-DNA test, Flexible Sigmoidoscopy, Colonoscopy, and CT Colonography (Virtual Colonoscopy).

180.    Early detection of cancer in patients is one of the best, and sometimes the only means to treat cancer such that it does not cause lasting, permanent injury, illness, or death.

181.    Early detection of cancer in patients necessarily allows patients to avail themselves of myriad forms of treatment, each of which is capable of altering the course of the illness, such as bringing the cancer into remission, removal of any malignant tumors, and other treatment to alleviate injury.

182.    The tests and treatments for the early detection and treatment of cancer must be prescribed by a qualified physician, and are conducted according to the latest, contemporary, and widely accepted scientific principles. Because benzene-associated cancer screenings may not be conducted with the frequency necessary to identify cancer in the absence of exposure to benzene, the prescribed monitoring regime is different from that normally recommended in the absence of exposure. Plaintiff Fahey and members of the Florida Subclass require more frequent screenings not within the purview of routine medical exams.

183.    The facts alleged above are sufficient or more than sufficient to plead a claim for medical monitoring as a cause of action. Plaintiff Fahey seeks, on behalf of herself and members of the Florida Subclass, injunctive and monetary relief, including compensatory damages for, and the creation of a fund to adequately finance the costs of, medical monitoring procedures (1) to notify and alert all people exposed to benzene as aforesaid of their exposure and the potential consequences, (2) to provide for necessary testing and screening including but not limited to blood tests, physical examinations, imaging, colonoscopies, endoscopies, and other similar methods for

examination, biopsies, pathologic, histologic, and oncologic evaluations, oncologic, histologic, surgical and other necessary medical consultations, (3) to provide for necessary medical and surgical procedures for diagnosis and treatment, (4) to provide for all necessary evaluations and treatment, attorneys' fees, costs, interest, and such further relief as the Court deems equitable and just.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendants as follows:

(a)     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as the representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel;

(b)     For an order declaring that Defendants' conduct violates the causes of action referenced herein;

(c)     For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)     For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded;

(f)     For an order of restitution and all other forms of equitable monetary relief;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated:  January 24, 2022                    Respectfully Submitted,

                                            **BURSOR & FISHER, P.A**

                                            By:    */s/ Andrew J. Obergfell*
                                                       Andrew J. Obergfell

                                            Andrew J. Obergfell, Esq.
                                            Max S. Roberts, Esq.
                                            888 Seventh Avenue
                                            New York, NY 10019
                                            Tel: (646) 837-7150
                                            Fax: (212) 989-9163
                                            E-Mail:  aobergfell@bursor.com
                                                        mroberts@bursor.com

                                            **BURSOR & FISHER, P.A.**
                                            Sarah N. Westcot, Esq.*
                                            701 Brickell Avenue, Suite 1420
                                            Miami, FL 33131
                                            Tel: (305) 330-5512
                                            Fax: (305) 676-9006
                                            E-Mail: swestcot@bursor.com

                                            **THE SULTZER LAW GROUP P.C.**
                                            Jason P. Sultzer, Esq.
                                            Joseph Lipari, Esq.
                                            Daniel Markowitz, Esq.
                                            270 Madison Avenue, Suite 1800
                                            New York, NY 10016
                                            Tel: (845) 483-7100
                                            Fax: (888) 749-7747
                                            E-Mail: sultzerj@thesultzerlawgroup.com
                                                        liparij@thesultzerlawgroup.com
                                                        markowitzd@thesultzerlawgroup.com

                                            **LEVIN SEDRAN & BERMAN**
                                            Charles E. Schaffer, Esq.*
                                            David C. Magagna Jr., Esq.*
                                            510 Walnut Street, Suite 500
                                            Philadelphia, PA 19106
                                            Tel: 215-592-1500
                                            E-Mail: dmagagna@lfsblaw.com
                                                        cschaffer@lfsblaw.com

**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
Nick Suciu, III, Esq.*
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
Fax: (865) 522-0049
E-Mail: nsuciu@milberg.com

**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
Jennifer Czeisler, Esq.*
Virginia Ann Whitener, Esq.*
Russell Busch, Esq.*
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
Fax: (865) 522-0049
E-Mail: jczeisler@milberg.com
        gwhitener@milberg.com
        rbusch@milberg.com

*Pro Hac Vice* Application Forthcoming

*Attorneys for Plaintiffs*