**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OTTO DELCID, LUZ ROMAN, MINA KALLAMNI, MARY MOLINA, CARLO GARCIA, and ANDREA FAHEY on behalf of themselves and all others similarly situated, | Case No. 1:21-cv-09569-DLC<br><br>Hon. Denise L. Cote |
| Plaintiffs, | |
| v. | |
| TCP HOT ACQUISITION LLC and IDELLE LABS, LTD, | |
| Defendants. | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF**
**MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS**

Dated:  March 24, 2023

**THE SULTZER LAW GROUP P.C.**
Jason P. Sultzer, Esq.
Philip J. Furia, Esq.
Mindy Dolgoff, Esq.
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Phone: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
furiap@thesultzerlawgroup.com
dolgoffm@thesultzerlawgroup.com

**BURSOR & FISHER, P.A.**
Max S. Roberts, Esq.
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Sarah N. Westcot, Esq.*
701 Brickell Avenue, Suite 1420
Miami, FL 33131

Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: swestcot@bursor.com

**LEVIN SEDRAN & BERMAN**
Charles E. Schaffer, Esq.*
David C. Magagna Jr., Esq.*
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
E-Mail: dmagagna@lfsblaw.com
           cschaffer@lfsblaw.com

**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
Nick Suciu, III, Esq.**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
Fax: (865) 522-0049
E-Mail: nsuciu@milberg.com

**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
Jennifer Czeisler, Esq.**
Virginia Ann Whitener, Esq.**
Russell Busch, Esq.**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
Fax: (865) 522-0049
E-Mail: jczeisler@milberg.com
           gwhitener@milberg.com
           rbusch@milberg.com

*Admitted *Pro Hac Vice*

***Pro Hac Vice* Application Forthcoming

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

Table of Contents…………………………………………………………………………………..i

Table of Authorities……………………………………………………………………………..ii-v

INTRODUCTION…………………………………………………………………………………...1

I.    CLASS COUNSEL PROVIDED A HIGH QUALITY OF REPRESENTATION TO THE CLASS (FOURTH *GOLDBERGER* FACTOR)……………………………..3

    A.  Class Counsel Received Excellent Results on Behalf of the Class……………….3

        1.  *The Monetary Relief Obtained is Significant When Compared to Plaintiffs' Best-Case Recovery*…………………………………………...3

        2.  *Minor Clerical Errors Should Not Negate Skillful Work Completed by Class Counsel*…………………………………………………………7

II.   AN EVALUATION OF THE RISK OF THE LITIGATION SUPPORTS CLASS COUNSEL'S REQUEST (THIRD *GOLDBERGER* FACTOR)……………………..8

III.  THE REQUESTED FEE IS REASONABLE IN RELATION TO THE SETTLEMENT (FIFTH *GOLDBERGER* FACTOR)……………………………..11

IV.  PUBLIC POLICY CONSIDERATIONS SUPPORT CLASS COUNSELS' FEE REQUEST (SIXTH *GOLDBERGER* FACTOR)…………………………………14

    A.  Consumer Class Actions Concerning Low-Value Claims Serve the Public Good……………………………………………………………………14

    B.  The Small Recovery by Class Members Does Not Weigh Against an Award of Attorneys' Fees…………………………………………………...17

    C.  Distribution of the Claims Here is Economically Feasible………………….19

    D.  There is No Evidence That the Cost of the Settlement Will Be Passed To Consumers……………………………………………………………………20

    E.  The Changed Practice and Injunctive Relief Provides Value and Serves as a Deterrent……………………………………………………………………21

CONCLUSION………………………………………………………………………………..23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Agent Orange Product Liab. Litig.*,
   818 F.2d 226 (2d Cir. 1987).....................................................................................8, 9

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591 (1997)......................................................................................................18

*Barnes v. Unilever United States Inc.*,
   2022 WL 2915629 (N.D. Ill. July 24, 2022).................................................................10

*Barnes v. Unilever United States Inc.*,
   2023 WL 2456385 (N.D. Ill. Mar. 11, 2023)................................................................10

*Beckman v. KeyBank, N.A.*,
   293 F.R.D. 467 (S.D.N.Y. 2013) .................................................................................11

*Carnegie v. Household Int'l, Inc.*,
   376 F.3d 656 (7th Cir. 2004) .......................................................................................18

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001)...........................................................................................6

*In re Citigroup Inc. Bond Litig.*,
   988 F. Supp. 2d 371 (S.D.N.Y. 2013)............................................................................6

*Clinger v. Edgewell Personal Care Brands, LLC*,
   2023 WL 2477499 (D. Conn. Mar. 13, 2023) .......................................................2, 9, 10

*In re ConAgra Foods, Inc.*,
   90 F.Supp.3d 919 (C.D. Cal. 2015) ...............................................................................5

*Copley v. Bactolac Pharm., Inc.*,
   2023 WL 2470683 (E.D.N.Y. Mar. 13, 2023).............................................................16

*deMunecas v. Bold Food, LLC*,
   2010 WL 3322580 (S.D.N.Y. Aug. 23, 2010)..............................................................15

*Deposit Guaranty Nat. Bank, Jackson, Miss. v. Roper*,
   445 U.S. 326 (1980)......................................................................................................18

*Ebin v. Kangadis Food Inc.*,
   297 F.R.D. 561 (S.D.N.Y. 2014) .................................................................................18

*Fox v. Vice*,
    563 U.S. 826 (2011)........................................................................................12

*Fresno Cnty. Emples. Ret. Ass'n v. Isaacson*,
    925 F.3d 63 (2d Cir. 2019)...............................................................................9

*Gagetta v. Walmart, Inc.*,
    --- F. Supp. 3d ---, 2022 WL 17812924 (N.D. Cal. Dec. 19, 2022) ..............10

*Gascho v. Glob. Fitness Holdings, LLC*,
    822 F.3d 269 (6th Cir. 2016) .........................................................................15

*Globus v. L. Rsch. Serv., Inc.*,
    418 F.2d 1276 (2d Cir. 1969).........................................................................15

*Goldberger v. Integrated Resources, Inc.*,
    209 F.3d 43 (2d Cir. 2000)....................................................................*passim*

*Gonzalez v. Pepsico, Inc.*,
    489 F. Supp. 2d 1233 (D. Kan. 2007)............................................................10

*Grice v. Pepsi Bevs. Co.*,
    363 F. Supp. 3d 401 (S.D.N.Y. 2019).............................................................6

*Harris v. Pfizer Inc.*,
    586 F. Supp. 3d 231 (S.D.N.Y. 2022) (Cote, J.) ...........................................10

*Jensen v. Cablevision Systems Corp.*,
    372 F. Supp. 3d 95 (E.D.N.Y. 2019) .............................................................19

*Jin v. Shanghai Original, Inc.*,
    990 F.3d 251 (2d Cir. 2021)...........................................................................15

*In re Johnson & Johnson Aerosol Sunscreen Mktg., Sales Pracs. And Prods. Liab.
Litig.*,
    2023 WL 2284684 (S.D. Fla. Feb. 28, 2023) ................................................11

*Jones v. Capitol Enterprises, Inc.*,
    89 So. 3d 474 (Ct. App. La. 2012).................................................................19

*Kurtz v. Kimberly-Clark Corp.*,
    321 F.R.D. 482 (E.D.N.Y. 2017).....................................................................5

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*,
    733 F. Supp. 2d 997 (E.D. Wis. 2010)............................................................6

*Lazy Oil Co. v. Witco*,
    95 F. Supp. 2d 290 (W.D. Pa. 1997)................................................................6

*T.K. ex rel. Leshore v. Bytedance Tech. Co.*,
    2022 WL 888943 (N.D. Ill. Mar. 25, 2022)............................................................18

*Mace v. Van Ru Credit Corp.*,
    109 F.3d 338 (7th Cir. 1997) ...................................................................................19

*Massiah v. MetroPlus Health Plan, Inc.*,
    2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012)..........................................................2

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    991 F. Supp. 2d 437 (E.D.N.Y. 2014) ......................................................................3

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
    Case No. 20-339-cv(L) (2d Cir. Mar. 15, 2023).......................................................9

*Perks v. TD Bank, N.A.*,
    2022 WL 1451753 (S.D.N.Y. May 9, 2022) ...........................................................16

*Price v. L'Oreal USA, Inc.*,
    2018 WL 3869896 (S.D.N.Y. Aug. 15, 2018) ...........................................................5

*In re Ramp Corp. Sec. Litig.*,
    2008 WL 58938 (S.D.N.Y. Jan. 3, 2008) (Cote, J.)...................................................8

*In re Ravisent Techs., Inc. Sec. Litig.*,
    2005 WL 906361 (E.D. Pa. Apr. 18, 2005) ..............................................................6

*Rosi v. Aclaris Therapeutics, Inc.*,
    2021 WL 5847420 (S.D.N.Y. Dec. 9, 2021) .............................................................6

*Savoie v. Merchants Bank*,
    166 F.3d 456 (2d Cir. 1999).....................................................................................12

*Schulte v. Fifth Third Bank*,
    805 F.Supp.2d 560 (N.D.Ill.2011) .......................................................................2, 6

*Selby v. Principal Mut. Life Ins. Co.*,
    197 F.R.D. 48 (S.D.N.Y. 2000) ..............................................................................17

*In re Sinus Buster Prod. Consumer Litig.*,
    2014 WL 5819921 (E.D.N.Y. Nov. 10, 2014).........................................................15

*Sitt v. Nature Bounty*,
    2016 WL 5372794 (E.D.N.Y. Sept. 26, 2016) ........................................................10

*In re Thornburg Mortg., Inc. Sec. Litig.*,
    885 F. Supp. 2d 1097 (D.N.M. 2012) .....................................................................18

*In re U.S. Foodservice Inc. Pricing Litig.*,
   729 F.3d 108 (2d Cir. 2013)...........................................................................18

*In re Valsartan*, *Losartan, and Irbesartan Products Liability Litig.*,
   2023 WL 1818922 (D.N.J. Feb. 8, 2023) .............................................................11

*Vandermast v. Wall & Associations, Inc.*,
   2022 WL 164307 (2d Cir. Jan. 19, 2022) .............................................................17

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004)............................................................................6

**Statutes**

FDCA (Food, Drug, and Cosmetic Act) ...............................................................10, 22

Fed. R. Civ. P. 23 ....................................................................................16

Rule 23(b)(3)......................................................................................18, 19

Rule 23…...........................................................................................17

Plaintiffs Otto Delcid, Luz Roman, Mina Kallamni, Mary Molina, Carlo Garcia, And Andrea Fahey ("Plaintiffs") respectfully submit this Supplemental Brief In Support of Their Motion for Attorneys' Fees, Litigation Costs, and Service Awards (ECF No. 86) (the "Motion" or "Mtn.").

## INTRODUCTION[1]

During the Final Approval Hearing on Plaintiffs' Motion, held before this Court on March 13, 2023 ("Final Approval Hearing"), the Court expressed several concerns regarding Class Counsel's fee request and the ultimate benefits achieved by this settlement.  Accordingly, and in response, Plaintiffs submit this brief to provide the Court with additional information and sources to address and alleviate its concerns.

*First*, the Court expressed the concern that the monetary recovery for the class was "*de minimus.*"  Final Approval Hearing Transcript ("Tr.") at 44:23.  To demonstrate the value and magnitude of this settlement, Plaintiffs consulted with and now provide declarations from experts Brian T. Fitzpatrick and Stefan Boedeker.  Professor Fitzpatrick is a highly respected professor of law at Vanderbilt University, who focuses his teaching and research on class action litigation.  Mr. Boedeker is a statistician and economist and a Managing Director at the Berkeley Research Group.  Mr. Boedeker's declaration supports the conclusion that Plaintiffs' counsel obtained monetary relief for the class amounting to approximately 41% of the maximum damages available to all class members (whether they submitted a claim or not) if the matter went to trial.  Professor Fitzpatrick confirms that this is an excellent recovery for the class, which is also supported by case law from the Second Circuit and courts throughout the country.  Moreover, as detailed in an

---

[1] Unless otherwise indicated, capitalized terms shall have the same meaning as they do in the Settlement Agreement. References to "§" are to sections of the Settlement Agreement, ECF No. 66-1.

attached declaration from Steven Weisbrot, the President and Chief Executive Officer of Angeion Group LLC ("Angeion"), the notice program in this matter was a resounding success and it is practical, common, and feasible to administer claims under $10.  Thus, Class Counsel submits that the record reflects that it handled this matter in a highly effective and professional manner, which resulted in a successful and valuable resolution on behalf of the class.

*Second*, the Court stated its view that this matter involved minimal risk to Plaintiffs and their counsel because Plaintiffs' case was likely to be dismissed if the matter was not settled.  While Plaintiffs recognize the fact that successfully opposing a motion to dismiss was far from a certainty, as detailed below, there is a large and growing number of cases around the country where plaintiffs asserting similar claims have defeated motions to dismiss.[2]  Surely, this body of law served as a significant motivating factor for Defendants in their decision to settle the case.  However, the fact that dismissal was a possibility underscores the risk undertaken by Plaintiffs' counsel in agreeing to litigate this matter on a contingent basis and to devote resources to this case instead of taking on other matters with, perhaps, a greater certainty of recovery.  Accordingly, Plaintiffs' counsel's fee application is bolstered by the risky nature of this litigation.  The Second Circuit has made clear that Plaintiffs' counsel should be rewarded for taking on such a risk.

*Third*, the Court noted that the fees requested by counsel here are extraordinary in nature.  Plaintiffs' counsel, however, submit that substantial precedent supports the request for fees.  *See*, *e.g.*, *Massiah v. MetroPlus Health Plan, Inc.*, 2012 WL 5874655, at *8 (E.D.N.Y. Nov. 20, 2012) ("A percentage-of-recovery fee award of one-third is consistent with [] Second Circuit[] [precedent]…").

---

[2] Indeed, in *Clinger v. Edgewell Personal Care Brands, LLC*, 2023 WL 2477499 (D. Conn. Mar. 13, 2023), issued mere hours after the Final Approval Hearing, the court largely denied defendants' motion to dismiss an action alleging similar claims based on sunscreen products contaminated with benzene.  Class Counsel Jason Sultzer and Charles Schaffer represent the plaintiffs and the class in that action.

*Fourth*, the Court expressed concerns about whether any public good was achieved by the Settlement. The Settlement serves to promote public policy goals by deterring bad behavior by corporate defendants in cases with low-value claims, which require the class action mechanism in order to vindicate the rights of individual class members.  On this point, Plaintiffs submit the declaration of F. Paul Bland Jr. as well as the declaration of Professor Fitzpatrick.  Mr. Bland is an attorney and the Executive Director of Public Justice, a national non-profit public interest advocacy organization.  His declaration supports the view that class actions like the one commenced by Plaintiffs herein are of great value and, importantly, do not drive-up costs for consumers. Similarly, Professor Fitzpatrick opines that the settlement offers considerable social value from the perspectives of both compensation and deterrence.  It is the kind of the settlement that should be incentivized with a proper fee award.

Against this backdrop, the following analysis of certain *Goldberger* factors can ameliorate the Court's concerns:

# I.   CLASS COUNSEL PROVIDED A HIGH QUALITY OF REPRESENTATION TO THE CLASS (FOURTH *GOLDBERGER* FACTOR)

## A.   Class Counsel Received Excellent Results on Behalf of the Class

### 1.   *The Monetary Relief Obtained is Significant When Compared to Plaintiffs' Best-Case Recovery*

The fourth *Goldberger* factor regarding the quality of representation, "may be measured in large part by the results that counsel achieved for the classes." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 441 (E.D.N.Y. 2014).  Here, the Court expressed concern over what this settlement accomplished in view of the size of each Class Member's individual recovery.  Tr. at 45:5-12.  But, when the recovery obtained by the Settlement is compared to what Plaintiffs may have recovered on their best day in court, it becomes clear that

this Settlement is well within, and even above, what courts routinely find fair, adequate, and reasonable, and therefore, warranting a fee award.

Respectfully, the Court should not overlook the great deal of experience and skill required to achieve this settlement at such an early stage in the litigation against such sophisticated defense counsel and corporate defendants.  Specifically, this action required a mastery of highly complex legal and technical principles, the ability to develop convincing legal theories, and the skill to respond to a host of well-curated defense arguments, including during the mediation with the Honorable Judge Steven Gold (Ret.) and throughout the negotiations with defense counsel.  Using this information along with consultants and experts, Class Counsel was able to present arguments on the strength of their claims during mediation and thereafter to ultimately achieve a recovery representing a significant percentage of the total amount that the class could potentially have obtained on its best day at trial.

Class Counsel's Motion focused on the average individual recovery.  Upon hearing the Court's comments at the Final Approval Hearing, Class Counsel expanded their analysis to provide the Court with what the total damages would have been based on the estimated class size in order to provide further context.  Professor Fitzpatrick opines that this provides a more accurate view of the compensation provided to class members.  Fitzpatrick Decl. ¶ 12.  Accordingly, after the Court's inquiry at the Final Approval Hearing as to the size of the Class and whether that could be measured by the 77% reach to the class, Class Counsel worked with the claims administrator in an effort to provide the Court with their best estimation.  *See* Weisbrot Affidavit ¶¶ 5-11 (explaining difference between reach and class size and estimating class size to be approximately 1,278,772

members).[3]  Based on this information, Plaintiffs' consultants and experts can estimate Plaintiffs'

maximum recovery at trial.  Under a full disgorgement theory where Plaintiffs would recover the

entire purchase price, the Settlement recovery is approximately 12.1% of total available damages.

*See* Fitzpatrick Decl. ¶ 13.  However, Plaintiffs were unlikely to obtain full disgorgement because

not all units of product were contaminated and Defendants would contend that contaminated

products are not completely worthless; i.e., they still have antiperspirant in them.  As such,

Plaintiffs would have proceeded with a price premium theory of damages at trial.  Under a price

premium theory, the best recovery more likely would have been approximately $9 million.  *See*

Boedeker Decl. ¶ 25 (attributing a 30% price premium to the Covered Products); *see also Price v.*

*L'Oreal USA, Inc.*, 2018 WL 3869896, at *3 (S.D.N.Y. Aug. 15, 2018); *Kurtz v. Kimberly-Clark*

*Corp.*, 321 F.R.D. 482, 551 (E.D.N.Y. 2017); *In re ConAgra Foods, Inc.*, 90 F.Supp.3d 919, 1026

(C.D. Cal. 2015) (citing cases where conjoint analysis was used to calculate price premium

damages at the class certification stage).  Accordingly, the settlement provides a 41%[4] recovery of

total available damages, which is well above what is generally obtained in class settlements.  *See*

Fitzpatrick Decl. ¶ 13 ("In my opinion, even the low end is good compared to recoveries in other

class actions, especially given how unlikely the full disgorgement theory was to succeed. But the

high end is well above average.").[5]

---

[3] The $30 million in wholesale sales that was used to estimate the class size was provided to Plaintiffs by Defendants. At the Final Approval Hearing, based on his understanding, Mr. Sultzer estimated that the amount of potentially contaminated units totaled $14 million.  The $30 million represents all units whether contaminated or not. Accordingly, the $30 million figure is a more conservative estimate for purposes of this Motion.  *See* Declaration of Jason Sultzer (Sultzer Decl.") at ¶ 1.

[4] The estimated 41% recovery was determined based on the estimated $9 million in total damages and using a 30% price premium off of the approximate total sales.

[5] In addition, the claims rate is exceptional compared to other, similar consumer cases, thus providing more compensation to individuals than the average class action.  Weisbrot Decl. ¶ 10 (When compared to other consumer settlements, an approximate claims rate of 26% is exceptional, being well above the average claims rates, which are routinely below 10 percent."); Fitzpatrick Decl. ¶ 12 ("[T]he median claims rate is 9% in cases where individual notice could be sent to at least some … Here, however, the claims rate is 26%. Thus, even if we focus on the class members

Indeed, courts within this Circuit have found much smaller and similar percentages of the total estimated recovery than the one in this case (either with full disgorgement or a price premium) enough to justify fee requests under the adequacy prong set forth in *Goldberger*. *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 379-80 (S.D.N.Y. 2013) (awarding requested fees where recovery amounted to 24% of total damages and noting "[t]hough the recovery here … represents only a fraction of the possible recovery estimated by plaintiffs' damages experts … that fraction is still an impressive result."); *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 5847420, at *7 (S.D.N.Y. Dec. 9, 2021) ("The $2.65 million gross recovery for the settlement class returns approximately 14% of Lead Plaintiff's estimated damages. Given the risks presented by the case, the Court views this as a favorable recovery for the class."); *Grice v. Pepsi Bevs. Co.*, 363 F. Supp. 3d 401, 408-09 (S.D.N.Y. 2019) ("the class members are receiving only approximately 5% of their maximum potential recovery. But considering the factual and legal hurdles that the class would have had to overcome before securing a favorable judgment, the current settlement represents a good result for the class members."); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538-39 (3d Cir. 2004) (33% of available damages was well within reasonable settlement range).[6]

---

who filed claims rather than the class as a whole, this settlement is delivering much more compensation than the typical class action.") (internal citations omitted).

[6] Courts routinely approve settlements as fair and reasonable when only a fraction of the total potential damages are recovered. *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 242 (3d Cir. 2001) (affirming decision that recovery of 9.25% of available damages was within range of reasonableness); *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1008 (E.D. Wis. 2010) (approving settlement worth between 4.4% to 13.6% of continued litigation); *In re Ravisent Techs., Inc. Sec. Litig.*, 2005 WL 906361, at *9 (E.D. Pa. Apr. 18, 2005) (approving settlement, which amounted to 12.2% of damages, and citing study by Columbia University Law School, which determined that "since 1995, class action settlements have typically recovered between 5.5% and 6.2% of the class members' estimated losses") (internal citations omitted); *Schulte v. Fifth Third Bank,* 805 F.Supp.2d 560, 583-84 (N.D.Ill.2011) (approving settlement amounting to approximately 10% of the class's maximum possible recovery); *Lazy Oil Co. v. Witco*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (approving settlement amounting to 5.35% of damages for the entire class period).

2.    *Minor Clerical Errors Should Not Negate Skillful Work Completed by Class Counsel*

The Court's concerns with the initial draft of the class notice and the release do not overshadow the skill and experience demonstrated by Class Counsel to achieve this result.  While Plaintiffs' counsel acknowledges there were a handful of typographical errors in the initial draft of the class notice,[7] they would have, in any event, been addressed prior to the notice being disseminated to the class.  Further, Plaintiffs' counsel maintains that the proposed notice nevertheless satisfied the main objective of what a class notice is meant to accomplish, which is to advise potential class members of the important elements and their rights regarding the settlement. Other than the few typos in the notice, the remainder of the Court's revisions were to conform the notice to the Court's stylistic preferences and to shorten the notice to reduce repetition.[8]  Finally, while the Court believed that the release in the Agreement was overbroad because it did not expressly exclude claims for personal injury, the parties specifically drafted the release to correspond solely with economic injury claims asserted in the complaint.  Indeed, the parties stated as such at the preliminary approval hearing.  Nonetheless, the parties adjusted the language at the Court's request.  Thus, the minor issues with the notice do not negate the exceptional work done by counsel to negotiate and secure a favorable settlement that was crafted before Judge Gold and fully endorsed by over 328,000 class members and experienced counsel.

To that end, Plaintiffs respectfully request that the Court analyze this *Goldberger* factor in

---

[7] The Court also noted that in the section of the class notice that discussed reimbursement of litigation expenses, there was a reference to deposition transcript fees and court reporter fees, but however no such expenses had been incurred at the time of the preliminary approval hearing.  Plaintiffs' counsel notes that those types of expenses were included as a general description of the types of expenses that may be incurred and requested at the completion of the settlement approval process.  Plaintiffs note that there is always the possibility that a deposition may need to be taken prior to the final approval of a settlement in the event of an objection and, moreover, since the preliminary approval hearing, the Plaintiffs have incurred transcript fees for the transcripts of the preliminary and final approval hearings.

[8] The parties included the repetitive portions in an effort to ensure that all class members were advised of the important aspects of the settlement even if only reading portions of the notice.  Such repetition is common in class notices.

the context of the benefits of early resolution; the significant settlement in comparison with the estimated total damages; and that this relief was obtained against companies represented by one of the largest and best defense firms in the country,[9] who would not have endorsed settling this case for millions of dollars if they thought the lawsuit would have been dismissed outright, especially with a fully briefed motion to dismiss pending before the Court.

## II.  AN EVALUATION OF THE RISK OF THE LITIGATION SUPPORTS CLASS COUNSEL'S REQUEST (THIRD *GOLDBERGER* FACTOR)

At the Final Approval Hearing the Court suggested that Class Counsel's fee request was unreasonable because the Court believed the lawsuit likely would have been dismissed at an early stage.  *See, e.g.*, Tr. at 10:21-22 ("[Y]ou understand there was a very serious risk of dismissal of this litigation altogether?"); *id.* at 44:23-24 ("Counsel are right that this litigation would never be filed by a plaintiff."); *id.* at 45:11-14 ("I have to ask, what is being accomplished? … [I]t's not clear to me [the case] would have survived a motion to dismiss."); *see also In re Ramp Corp. Sec. Litig.*, 2008 WL 58938, at *4 (S.D.N.Y. Jan. 3, 2008) (Cote, J.) (awarding reduced attorneys' fees because "it is open to question whether this lawsuit would ever have been pursued by thoughtful counsel.").  Respectfully, an evaluation of the risk of the litigation that is consistent with Second Circuit precedent supports the reasonableness of Class Counsel's request.

The "risk of litigation" factor "takes into account the realities of a legal practice by rewarding counsel for those successful cases in which the probability of success was slight and yet the time invested in the case was substantial."  *In re Agent Orange Product Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987).  "The need for this type of multiplier is magnified when the diminutive character of the individual claims forces counsel to bring the action on a class basis."  *Id.* (internal

---

[9] *See* https://www.sidley.com/en/services/consumer-class-actions, ("Sidley Recognized as a Leading Nationwide Practice for Consumer Class Actions by *Chambers USA*") (last accessed March 24, 2023)

citations omitted).   "Risk falls along a spectrum, and should be accounted for accordingly." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 54 (2d Cir. 2000).

The Second Circuit provided its most succinct explanation of the "risk of litigation" factor in its 2019 opinion in *Fresno Cnty. Emples. Ret. Ass'n v. Isaacson*, 925 F.3d 63 (2d Cir. 2019). There, the Court expounded on the concept as follows:

> The plaintiff class is therefore appropriately charged for contingency risk where such risk is appreciable because the class has benefited from class counsel's decision to devote resources to the class's cause at the expense of taking other cases.   That is, because class counsel has decided to represent the plaintiff class, class counsel's ability to freely represent other clients is limited by the risk she has assumed that the class's cause will be unsuccessful.   The class, having been enriched by counsel's acceptance of its cause at the expense of other clients' causes, may be charged for counsel's assumption of risk on its behalf.

*Id.* at 70.   The Second Circuit reaffirmed this interpretation of the "risk of litigation" factor in decision issued on March 15, 2023 in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 20-339-cv(L) (2d Cir. Mar. 15, 2023),[10] where the Court noted that "[t]he true risk we identified in *Fresno County* was the risk that a case taken on contingency *will fail*."   *Id*. at 50 (emphasis in original).   Accordingly, this Court's recognition that this case carried with it a significant litigation risk strongly supports counsel's fee request.

Though there was a degree of risk in litigating this case, this is certainly not a case where the fee award should be reduced because this case was "of highly questionable merit."   *In re Agent Orange Product Liab. Litig.*, 818 F.2d at 235.   To the contrary, this case had a strong basis in the law and numerous courts have upheld similar allegations in cases concerning the contamination of consumer products.   *See generally*, *e.g.*, *Clinger v. Edgewell Personal Care Brands, LLC*, 2023 WL 2477499 (D. Conn. Mar. 13, 2023) (largely denying motion to dismiss case concerning

---

[10] As of the date of this filing, this Order was not yet available on Lexis or Westlaw.   For the Court's convenience, the Order is attached to the Sultzer Declaration as **Exhibit A**.

sunscreen products contaminated with benzene); *Barnes v. Unilever United States Inc.*, 2023 WL 2456385 (N.D. Ill. Mar. 11, 2023) (largely denying motion to dismiss case concerning antiperspirant product contaminated with benzene); *Barnes v. Unilever United States Inc.*, 2022 WL 2915629 (N.D. Ill. July 24, 2022) (same); *Gagetta v. Walmart, Inc.*, --- F. Supp. 3d ---, 2022 WL 17812924 (N.D. Cal. Dec. 19, 2022) (largely denying motion to dismiss case concerning spices product contaminated with heavy metals); *Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233 (D. Kan. 2007) (largely denying motion to dismiss case concerning soda product contaminated with benzene); *Sitt v. Nature Bounty*, 2016 WL 5372794 (E.D.N.Y. Sept. 26, 2016) (largely denying motion to dismiss concerning supplements contaminated with small amounts of lead).

Indeed, in a decision that was rendered on the same day as the Final Approval Hearing, a Connecticut District Court largely denied a motion to dismiss in similar case involving claims that sunscreen products were contaminated with benzene. *Clinger*, 2023 WL 2477499. The *Clinger* court held, *inter alia*, that under Second Circuit precedent: (i) four of the seven plaintiffs have standing because they bought products that were in the same product line as those that tested positive for benzene; (ii) plaintiffs' claims were not expressly preempted by the FDCA or related FDA regulations; (iii) other than part of one claim, plaintiffs' claims were not impliedly preempted; and (iv) primary jurisdiction should not be invoked. *Id.* Defendants in this matter were making the same arguments made in *Clinger* in support of dismissal. Moreover, the case here is stronger than some of the other similar cases that were dismissed. For example, this Court dismissed the case *Harris v. Pfizer Inc.*, 586 F. Supp. 3d 231, 237 (S.D.N.Y. 2022) (Cote, J.) based partly on the plaintiffs' failure to allege defendant had knowledge that the product at issue was contaminated. In addition, the plaintiffs in *Harris* failed to sufficiently allege defendant's breach of current good manufacturing practices. Here, Plaintiffs alleged that Defendants had knowledge

10

that the Covered Products were contaminated with benzene and also that good manufacturing practices and procedures were not followed and employed leading to benzene contamination or risk of benzene contamination. *See*, *e.g.*, CCAC ¶¶ 20, 23.

These authorities indicate that while Plaintiffs' claims faced risk, their claims had at least an equally strong chance of surviving the pleadings and even being certified as a class. *See generally In re Valsartan*, *Losartan, and Irbesartan Products Liability Litig.*, 2023 WL 1818922 (D.N.J. Feb. 8, 2023) (certifying class of consumers who purchased high blood pressure medications contaminated with NDMA). Accordingly, the risks of the litigation should be assessed favorably towards Class Counsel, not against them. *See In re Johnson & Johnson Aerosol Sunscreen Mktg., Sales Pracs. And Prods. Liab. Litig.*, 2023 WL 2284684, at \*12 (S.D. Fla. Feb. 28, 2023) ("Given the risks inherent in this litigation, the efficient way in which Class Counsel was able to negotiate a nationwide resolution to this matter … and the significant value of the changed business practices adopted by JJCI, such an award [of \$2.5 million in attorneys' fees] is appropriate").

## III. THE REQUESTED FEE IS REASONABLE IN RELATION TO THE SETTLEMENT (FIFTH *GOLDBERGER* FACTOR)

At the Final Approval Hearing, the Court expressed concern that Class Counsel's fee request is an "extraordinary request in terms of a lodestar for a case that was settled so early." Tr. At 45:16-17. Class Counsel submits that when evaluated under a percentage-of-the-fund theory, Class Counsel's request for one-third of the fund is reasonable and consistent with Second Circuit precedent. *See*, *e.g*, *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 477 (S.D.N.Y. 2013) ("Class Counsel's request for 33% of the Fund is reasonable and consistent with the norms of class litigation in this circuit."). Under this theory, lodestar is to serve as a cross-check and not intended to require an extensive examination of counsel's hours. *Goldberger*, 209 F.3d at 50 ("Of course,

11

where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court."); *see also Fox v. Vice*, 563 U.S. 826, 838 (2011) ("The fee applicant (whether a plaintiff or a defendant) must, of course, submit appropriate documentation to meet the burden of establishing entitlement to an award. But trial courts need not, and indeed should not, become green-eyeshade accountants.") (internal quotations and citations omitted). Thus, under the percentage-of-the-fund theory Class Counsel has no incentive to inflate its lodestar as it would have requested the same percentage of the fund whether its lodestar was higher or lower. *Savoie v. Merchants Bank*, 166 F.3d 456, 460-61 (2d Cir. 1999) ("It has been noted that once the fee is set as a percentage of the fund, the plaintiffs' lawyers have no incentive to run up the number of billable hours for which they would be compensated under the lodestar method").

As indicated in their Motion and at the Final Approval Hearing, Class Counsel conducted significant work over nearly two years, which included extensive research and pre-suit investigation, drafting the consolidated complaint, briefing the motion to dismiss, and working diligently through mediation and ultimately settlement. ECF No. 87 at 9-12; Tr. at 39:19-40:3. Regardless, Class Counsel should not be penalized for working efficiently to resolve this case at an early stage, especially where Class Counsel still put substantial work into the lawsuit to ensure a favorable result for the Class.

Furthermore, the fee request is not "extraordinary" when it is evaluated in the context of the considerable social value from the perspectives of both compensation and deterrence that it provides. *See* Fitzpatrick Decl. ¶ 6. As Professor Fitzpatrick opined "[i]t is the kind of the settlement that should be incentivized with a proper fee award." *Id.* Professor Fitzpatrick measured and evaluated the compensation by looking at how much the Class as a whole will receive and compared it to what the Class would likely receive at trial on their best day. *Id.* ¶ 13.

Professor Fitzpatrick found "[t]he class as a whole here is recovering somewhere between 12.1% (full disgorgement) and 41% (price premium) of what it might have recovered at trial. In my opinion, even the low end is good compared to recoveries in other class actions, especially given how unlikely the full disgorgement theory was to succeed.  But the high end is well above average." *Id.*

The social value of the settlement due to the deterrent effect it has on corporate conduct further supports the requested fee as explained by Professor Fitzpatrick.  *See* Fitzpatrick Decl. ¶¶ 14-17. As Professor Fitzpatrick aptly stated:

> "If companies know that they will have to pay millions of dollars when, for example, they sell contaminated products, they will be more careful about selling contaminated products.  If we don't hold companies accountable for small harms, it will be like giving them a greenlight to engage in such harms.  Eventually, the greenlighted small harms will add up to significant harm that people will notice.  *In my opinion, this settlement delivers both specific deterrence[11] and general deterrence[12].*"

*Id.* ¶ 14 (emphasis added).

As a result of the considerable compensation and deterrence provided by this Settlement, society and all consumers are far better off than they would have been without the settlement, and as such, Class Counsel should be awarded the requested fee.

---

[11] "Specific deterrence occurs when the Defendants themselves stop the alleged misconduct.  This settlement delivers that because it requires the Defendants to begin testing their products for benzene.  Maybe the Defendants would have done that anyway given the trouble not testing all these years has gotten them in here, but maybe not.  But because of this settlement, we don't have to guess: the Defendants are required to do it.  Presumably, if they find benzene in the future, they will pull those products from the shelves and the legal violations alleged here will be avoided in the future." Fitzpatrick Decl. ¶ 15.

[12] "General deterrence occurs when potential wrongdoers take steps to avoid wrongdoing because they expect to be punished financially if they do not.  As I explain in THE CONSERVATIVE CASE FOR CLASS ACTIONS, most of the empirical studies of class action lawsuits find that they have a positive, statistically significant effect on general deterrence. *See id.* at 109-122.  In my opinion, this settlement is one that will contribute to this effect.  The Defendants have been punished to the tune of $3.65 million, or 12.1% of the entire revenue they collected for all of the products in question sold for many, many years.  Few industries operate at profit margins much above 12.1%.  This settlement therefore tells corporate executives that, if they are not careful about what they put on the shelves, they will lose their entire profit margins.  That is exactly how our civil justice system should work." *Id.* ¶ 16.

**IV.    PUBLIC POLICY CONSIDERATIONS SUPPORT CLASS COUNSELS' FEE REQUEST (SIXTH *GOLDBERGER* FACTOR)**

**A.    Consumer Class Actions Concerning Low-Value Claims Serve the Public Good**

The Court also expressed concern over the public policy relating to this settlement.  Tr. at 44:21-23 ("I'm not clear that there's any public good achieved by this litigation. The amount to any individual claimant is *de minimus*, miniscule.").  However, public policy favors class actions like this one and supports awarding attorneys' fees in such actions.  Providing no incentives to attorneys who pursue class action claims for small consumer goods gives defendants leeway to get away with negligent conduct and society ultimately suffers the consequences. DETERRENCE, 1 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 1:8 (6th ed. 2022) ("[W]here harms are small and dispersed, the defendants can avoid liability because no individual has sufficient incentive to sue. By avoiding liability, the defendants place the social costs of their actions on others."); *see also* Fitzpatrick Decl. ¶ 9 ("Class action lawyers level the playing field and overcome the enforcement gap that would otherwise exist in our country by aggregating non-viable and underinvested claims into effective litigation vehicles.").  By "enabling small-claim suits, class actions expose the defendants to the risk of liability and thereby deter them from engaging in wrongdoing in the first place."  Deterrence, 1 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 1:8. Small-claim consumer class actions are simply "an evolutionary response to the existence of injuries unremedied by the regulatory action of government."  *Id.*

Indeed, class action attorneys perform a critical function in our society where regulators do not have the resources to do anything and consumers have no incentive to bring their own lawsuits. *See* Fitzpatrick Dec ¶ 9 ("[C]lass action lawyers perform a critical law enforcement role in our country—which is why they are often referred to as 'private' attorneys general … 'public' attorneys general have very limited resources and often "captured" by the industries they are

supposed to regulate."). In this case, the government did not act, so Class Counsel stepped up. Fitzpatrick Decl. ¶ 10.

Courts within this Circuit agree that small claims class actions are worthwhile pursuits in which class counsel should be compensated for their efforts. *See Globus v. L. Rsch. Serv., Inc.*, 418 F.2d 1276, 1285 (2d Cir. 1969) ("Compensatory damages, especially when multiplied in a class action, have a potent deterrent effect."); *deMunecas v. Bold Food, LLC*, 2010 WL 3322580, at *8 (S.D.N.Y. Aug. 23, 2010) ("Where relatively small claims can only be prosecuted through aggregate litigation, and the law relies on prosecution by 'private attorneys general,' attorneys who fill the private attorney general role must be adequately compensated for their efforts."); *In re Sinus Buster Prod. Consumer Litig.*, 2014 WL 5819921, at *19 (E.D.N.Y. Nov. 10, 2014) ("Public policy generally favors the award of reasonable attorneys' fees in class action settlements, especially where, as here, class members would be unlikely to pursue a case individually given that the costs substantially outweigh any potential recovery."); *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 259 (2d Cir. 2021) ("The private attorney general concept relates to the objectives of the class action device, which include deterring misconduct through private enforcement of vital public policies …").

Because of the potential for large liability exposure, consumer class actions serve as strong antidote to corporate wrongdoing. *See Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 287 (6th Cir. 2016) ("Consumer class actions, furthermore, have value to society more broadly, both as deterrents to unlawful behavior—particularly when the individual injuries are too small to justify the time and expense of litigation—and as private law enforcement regimes that free public sector resources. If we are to encourage these positive societal effects, class counsel must be adequately compensated—even when significant compensation to class members is out of reach

15

(such as when contact information is unavailable, or when individual claims are very small).")(footnotes omitted).

In fact, Judge Block in the Eastern District of New York recently stated:

Presumably, the class settlement will incentivize Defendants to be more vigilant about the safety and cleanliness of their product in the future, and others in their industry will be encouraged to do the same. Although the market may view the $100,000 cash payout to class members as relatively low, the total cash payment to the Settlement Fund of $1.725 million, as well as the additional cost to Defendants of this litigation, serves a deterrent purpose.

*Copley v. Bactolac Pharm., Inc.*, 2023 WL 2470683, at *10 (E.D.N.Y. Mar. 13, 2023).  In addition, as Mr. Fitzpatrick states "social value can be determined by looking to how much compensation it delivers to class members as well as how much deterrence it delivers to society." Fitzpatrick Decl. ¶ 11.  As discussed above in Argument § I.A.1., *supra*, the Settlement provides substantial value. Focusing solely on the monetary relief negates the total value of this settlement because it also includes injunctive relief and has a deterrent effect on others to clean up their manufacturing processes.  CRITERIA FOR APPROVAL, ANN. MANUAL COMPLEX LITIG. § 21.71 (4th ed. 2022) ( "If a case is primarily concerned with injunctive or declaratory relief, exclusive concern with monetary benefits may not be appropriate."); *see also* Fed. R. Civ. P. 23 (advisory committee notes) ("At the same time, it is important to recognize that in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fees award.); *Perks v. TD Bank, N.A.*, 2022 WL 1451753, at *2 (S.D.N.Y. May 9, 2022) ("When calculating the overall settlement value the Court has to consider the value of both the monetary and non-monetary benefits conferred on the Class.")

As discussed below, Defendants now have an independent obligation to ensure the Covered products are screened for benzene content, which did not exist before this settlement.  Moreover, such testing is not required by law.  *See* Argument § IV.E, *infra*.  Further, while Plaintiffs have not

placed a monetary value on the injunctive relief, it is significant because it prevents future injuries to all consumers and a factor that Court must consider in awarding fees. MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR JUDGES, at 21 (3d ed. 2010)[13] ("In many cases, by putting an end to illegal practices, an injunction will benefit more class members than a small award. It will also avoid clogging the judicial system with the administration of small awards to thousands of class members.").

### B.   The Small Recovery by Class Members Does Not Weigh Against an Award of Attorneys' Fees

The Court also expressed concern regarding the size of individual recovery and the distribution of the proceeds to individual Class Members. Tr. at 13:5-9 (noting "in many class action lawsuits where there is a [distribution] of money, the cutoff is at $10 that the cost of administering a settlement where the amount of money you'd be returning to claimants is less than $10 does not make economic sense"). A review of Supreme Court and Second Circuit precedent along with Mr. Weisbrot's declaration should alleviate the Court's concern on this point.

Both New York and the Second Circuit maintain a strong policy favoring consumer class actions. *Vandermast v. Wall & Associates, Inc.*, 2022 WL 164307, at *2 (2d Cir. Jan. 19, 2022) ("[I]t is true that New York maintains a strong public policy in favor of consumer class actions."); *Selby v. Principal Mut. Life Ins. Co.*, 197 F.R.D. 48, 54 (S.D.N.Y. 2000) ("[T]he law in the Second Circuit favors the liberal construction of Rule 23…."). In addition to the policy reasons set forth above (Argument § IV, *supra*), the public policy underlying class actions is the vindication of claims where damages are small or *de minimis*. As the Supreme Court has noted:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem

---

[13] Available at https://multijurisdictionlitigation.files.wordpress.com/2012/11/classgd3.pdf.

by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (internal citations omitted); *see also Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.") (emphasis in original).  Class Counsel located a decision in which a court (i) approved a settlement in which "the average recovery per damaged shares will be $.01"; and (ii) "instructed the parties to delete the sentence: "No distribution will be made on a claim where the potential distribution amount is less than ten dollars ($10.00) in cash" from the settlement agreement.  *In re Thornburg Mortg., Inc. Sec. Litig.*, 885 F. Supp. 2d 1097, 1105 (D.N.M. 2012); *see also T.K. ex rel. Leshore v. Bytedance Tech. Co.*, 2022 WL 888943, at *20 (N.D. Ill. Mar. 25, 2022) ("[T]he recovery of $3.06 per claimant is a meaningful benefit…").

Further, courts within the Second Circuit and other have held that cases concerning small or *de minimis* individual damages are *precisely* the circumstances under which a class action is warranted most.  *See*, *e.g.*, *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) ("As the Supreme Court has said, Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery."); *Deposit Guaranty Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 338-39 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device."); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 567 (S.D.N.Y. 2014) ("[T]he class action device, at its very core, is designed for cases like this where a large number of consumers have been defrauded but no one consumer has suffered an injury sufficiently large as to justify bringing an individual

18

lawsuit."); *Jensen v. Cablevision Systems Corp.*, 372 F. Supp. 3d 95, 130 (E.D.N.Y. 2019) ("Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery."); *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997) ("[W]e believe that a de minimis recovery (in monetary terms) should not automatically bar a class action."); *Jones v. Capitol Enterprises, Inc.*, 89 So. 3d 474, 492 (Ct. App. La. 2012) ("[I]t is a troubling proposition that a tortfeasor can be relieved of responsibility if its conduct produces minimal harm, albeit to many people"); Alon Harel & Alex Stein, *Auctioning for Loyalty: Selection and Monitoring of Class Counsel*, 22 YALE L. & POL'Y REV. 69, 81 (2004) ("Class action is a mechanism that turns a dispersion of non-assets into an asset by consolidating a large number of economically senseless lawsuits into a single lawsuit that makes economic sense … [W]hen [*de minimis*] lawsuits are numerous, and when they complain that some wrong was recurrently perpetrated by a single defendant or by a group of defendants, they ought to be prosecuted.  If such numerous lawsuits are not carried out, the deterrence and the compensation objectives of the law would be undermined quite severely.").

As it stands, Supreme Court and Second Circuit policy supports bringing class actions to vindicate claims where damages are small or even *de minimis*.  Thus, there is no floor where damages are so small that distributing settlement proceeds does not make "economic sense."

### C.    Distribution of the Claims Here is Economically Feasible

As Mr. Weisbrot explains, the average recovery for Class Members here "is consistent with other consumer marketing and sale settlements that Angeion has administered."  Weisbrot Decl. ¶¶ 13-15.  Accordingly, Mr. Weisbrot determined that "issuing settlement benefits under $10.00 to claimants is both economically feasible from an administrative cost perspective and is worthwhile to the Class Members who submitted a Valid Claim," especially given "approximately 96% of claimants selected a digital payment option rather than a traditional paper check," which

"are most cost effective, as they do not require that hard expenses, such as postage, be incurred in order to issue the payment." *Id.* ¶¶ 17, 16 n.8.

### D.     There is No Evidence That the Cost of the Settlement Will Be Passed To Consumers

The Court expressed its concern that the costs of the settlement will be passed on to the consumer.  Tr. at 45:7-8.  Studies and empirical evidence show that class actions do not drive-up costs to consumers and that there is little pressure on companies to settle frivolous suits.  *See* Bland Decl. ¶¶12-16.  Mr. Bland discusses a study in which it was determined that "banks that use arbitration clauses that banned class actions did *not* reduce the interest and fees they charged consumers." *Id.* ¶ 13.  The empirical data showed that "[t]he banks who were subject to class actions charged consumers the same rates as banks who were not." *Id.*  Thus, the elimination of class actions did not affect the cost to consumers.

Economic realities also belie the argument that companies will simply pass the cost of a small settlement onto consumers:

> Such a critic here might say the following: consumers will end up paying 100% of this settlement through higher prices but get only 66% of it back through the settlement because the lawyer takes the other third.  There is nothing about this critique that is unique to class actions; it could apply to any attempt in our civil justice system to hold a corporation accountable. But the critique assumes that consumers will buy the same amount of the defendants' products in the future even at the higher prices.  Why would that be so?  If the defendants could have sold the same number of units at a higher price, they would have charged the higher price all along.  That is, passing liability onto consumers through higher prices causes companies harm in the marketplace as consumers compare prices of different products against one another.  Everything being else equal, scrupulous companies with lower litigation liabilities will be able to charge less than unscrupulous companies with greater litigation liabilities.  Over time, the better companies will win out over the worse companies.  This is known as the "market allocation" effect of general deterrence.

Fitzpatrick Decl. ¶ 17.

Moreover, Mr. Bland notes that "[t]he best empirical evidence about class-action litigation shows that pressure to settle frivolous claims is greatly exaggerated, if it exists at all." Bland Decl. ¶ 14 (*citing* Allan Kanner & Tibor Nagy, *Exploding the Blackmail Myth: A New Perspective on Class Action Settlements*, 57 BAYLOR L. REV. 681, 693 (2005)). Another study by the Federal Judicial Center found that meritless class actions were disposed of by rulings on motions to dismiss or summary judgment and not through settlements. *Id* ¶ 15 (citing FEDERAL JUDICIAL CENTER, EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR DISTRICT COURTS; FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES, at 90 (1996).

### E.      The Changed Practice and Injunctive Relief Provides Value and Serves as a Deterrent

Class Counsel wishes to address the Court's concern regarding the "Changed Practices and Injunctive Relief" section of the Settlement Agreement (§ IV) as Class Counsel believes the Court misapprehended the nature of this provision of the Agreement.  Settlement § 4.2 requires and obligates Defendants to ensure the Covered Products will be "screen[ed] for benzene" and that "any detectable benzene" be addressed as warranted.  This provision of the Settlement imposes a contractual obligation on Defendants regarding testing for the presence of benzene that was not required of them prior to this Settlement.  This amounts to much more than a mere agreement to follow the law.  While the language of § 4.2 does include language requiring the Defendants to "comply with federal standards and regulations relating to the presence of benzene," there are no current regulations relating to the presence of benzene.  The current regulatory landscape only includes guidelines regarding acceptable levels of benzene in drug products (2 parts per million or 2ppm) if the presence of benzene is "unavoidable in order to produce a drug product with a significant therapeutic advance."  CCAC ¶ 10.  However, it is hotly disputed as to whether those

21

guidelines apply to the Covered Products.[14]   Indeed, one of the main purposes of the Valisure Petition was to request that the FDA investigate and "develop guidance documents for the analysis of benzene in body spray products" and "review and update the current FDA guidance 'Q3C – Tables and List, Guidance for Industry' to include guidance for the acceptable concentration of benzene for drug products, such as body sprays,… or potentially expand the current statement that benzene 'should not be employed in the manufacture of drug substances' to clarify that there is no acceptable level of benzene and define a reasonable limit of detection."   VALISURE CITIZEN PETITION ON BENZENE IN BODY SPRAY PRODUCTS, at 2 (2021).[15]

Thus, at the time that Settlement was negotiated, Defendants were under no obligation to screen the Covered Products for benzene.  Further, if at the time that the Settlement was negotiated, Defendants had already put plans in action to screen the Covered Products for benzene, they were under no obligation to continue to do so.  As Defendants stated at the Final Approval Hearing "I do agree with Mr. Sultzer that [D]efendants have taken on additional obligation contractually precisely the obligation that we said did not exist as a matter of federal law in our motion to dismiss brief."  Tr. at 32:18-22.

The parties made clear at the Final Approval Hearing that both parties intended and interpreted this provision as requiring Defendants to take on an additional obligation that did not exist prior to this Settlement.  Considering that the Defendants have stated that prior to the Settlement, they did not believe that they were under any obligation to screen for benzene, there

---

[14] *See* Tr.at 32:12-18 ("we argued full-throatedly on page 16 of or opening brief in support of the motion to dismiss that plaintiffs were indeed trying to impose a good manufacturing practice that did not exist under the Food, Drug, and Cosmetic Act on to benzine [sic]. And so we have, in fact, taken the very position that Mr. Sultzer anticipated we might take.").

[15] Available at https://assets-global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf (the "Valisure Petition").

is no question that Plaintiffs have created value in obligating them to do so for at least 18 months. Without the Settlement here, there is no mechanism in place to ensure that the Covered Products are screened for benzene and that they will continue to be screened. *See* Fitzpatrick Decl. ¶ 15 ("This settlement delivers specific deterrence because it requires the Defendants to begin testing their products for benzene. Maybe the Defendants would have done that anyway given the trouble not testing all these years has gotten them into here, but maybe not. But because of this settlement, we don't have to guess … That is 'textbook specific deterrence'").

## **CONCLUSION**

Ultimately, the Settlement reached here is one that provides significant relief when evaluated in context and is one that has been: (i) settled under the well-respected Hon. Steven Gold (ret.) as mediator; (ii) fully endorsed by over 328,000 Class Members and no objectors; (iii) fully endorsed by Class Counsel who have decades of experience litigating class actions such as these, and Professor Brian Fitzpatrick, one of the most published and respected authorities in class actions.

Class Counsel thanks the Court for the opportunity to address its concerns and provide more information and clarity on the relevant issues.  This submission should underscore the fact that this litigation and this settlement serves the extraordinarily important goal of vindicating consumers who unwittingly purchased a product which contained or was at risk of containing a known carcinogen.  Class Counsel hopes that the additional information submitted herein allays any and all of the Court's concerns and impresses upon the Court just how seriously Class Counsel takes its obligations to Class Members and how hard Class Counsel worked to achieve what they believe is an extraordinary result on behalf of the class and all consumers.

Dated: March 24, 2023                    Respectfully submitted,

**THE SULTZER LAW GROUP, P.C.**

By:   _/s/ Jason P. Sultzer_
Jason P. Sultzer, Esq.
Philip J. Furia, Esq.
Mindy Dolgoff, Esq.
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Phone: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
furiap@thesultzerlawgroup.com
dolgoffm@thesultzerlawgroup.com

**BURSOR & FISHER, P.A.**
Max S. Roberts, Esq.
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-Mail: mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Sarah N. Westcot, Esq.*
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: swestcot@bursor.com

**LEVIN SEDRAN & BERMAN**
Charles E. Schaffer, Esq.*
David C. Magagna Jr., Esq.*
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
E-Mail: dmagagna@lfsblaw.com
              cschaffer@lfsblaw.com

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
Nick Suciu, III, Esq.**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301

Tel: (313) 303-3472
Fax: (865) 522-0049
E-Mail: nsuciu@milberg.com

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
Jennifer Czeisler, Esq.**
Virginia Ann Whitener, Esq.**
Russell Busch, Esq.**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
Fax: (865) 522-0049
E-Mail: jczeisler@milberg.com
          gwhitener@milberg.com
          rbusch@milberg.com

*Admitted *Pro Hac Vice*
***Pro Hac Vice* Application Forthcoming

*Attorneys for Plaintiffs and the
Settlement Class*